STATE of Missouri, Respondent,

v.

Allen Russell THURMAN, Appellant.

No. KCD 27026.

Missouri Court of Appeals,
Kansas City District.

March 31, 1975.

Henry H. Fox, Jr., Errol Copilevitz, Kansas City, for appellant.

John C. Danforth, Atty. Gen., Paul Robert Otto, Asst. Atty. Gen., Jefferson City, for respondent.

Before SOMERVILLE, P. J., PRITCH-ARD, C. J., and SWOFFORD, J.

PRITCHARD, Chief Judge.

Upon an indictment of manslaughter in the death of 2½ year old William M. Thomas, a child born of appellant's wife prior to their marriage, appellant was found guilty and his sentence was set at the maximum 10 years imprisonment by the verdict of a jury.

Because of prejudicial error in permitting appellant's wife to be questioned on cross-examination concerning whether she denied ever telling any person that appellant picked up a cat and threw it against the wall and killed it, this case must be reversed and remanded for a new trial. A

state's rebuttal witness was asked, with no response, whether appellant's wife ever told her that he lost control of himself and threw a cat against a wall until it died, to which appellant objected and moved for a mistrial. The objection was overruled.

At about 11:00 p. m., on April 19, 1973, appellant picked up the child from a baby-sitter's home, and took him to his own home where he prepared him for bed, and found that the child had soiled his pants because of diarrhea. Appellant gave the child a spanking as "potty" discipline, which caused him to cry. He was put to bed, still crying, and appellant went to another room to eat and watch television.

While there, according to appellant's statement given to the police, the child started choking and coughing. "I went in there to see if I could help him and he was having trouble breathing. I tried to help him but he wouldn't stop and couldn't catch his breath. I put him on the floor and I was pushing on his stomach and chest trying to get him to stop. He wouldn't stop and I just got carried away. I lost control of myself and became angry because he was crying and coughing. I tried to help him but he couldn't breathe. I could see then that he was going to have to go to the hospital, so I put him in the car and took him to the hospital. * * * Q. Allen, you said that you lost control of yourself and lost your temper when you were trying to get him to quit coughing and help him breathe. During this did you slap him or hit him? A. Yes, I did slap him a couple of times. Q. Where did you slap him? A. In the face. * * * My wife has told me that it helps him to catch his breath. Q. Were you angry at the time you slapped him? A. Yes. Q. Allen, when you were applying artificial respiration by pushing on his abdomen and chest, you said you got carried way. What did you mean by this? A. I couldn't help myself, I couldn't make myself stop. Q. In other words you knew you were being too rough but couldn't control your-

self? A. Right. Q. What else did you do to William Michael when you were in this angry condition? A. Nothing other than just pushing on him. I knew it was too hard, but I couldn't stop. Q. When did you realize that the child was seriously injured? A. When I couldn't get any response out of him and couldn't revive him. He was still breathing but it wasn't too good and I knew I should get him to the hospital."

Aleita M. Harvey, the babysitter, testified that the child did have some small bruises on April 19, 1973, and his tongue on both sides looked like his jaw teeth had clamped there, prior to the time appellant picked him up. However, the child did not leave her house looking injured or bleeding about the mouth. He had not been coughing a lot, nor did he appear to be ill. The photographs (in evidence and shown to Aleita) show more bruises than she saw on his body.

Dr. Jose R. Samoza, M. D., a pathologist, performed a post-mortem examination of the child's body on April 20, 1973, after he had been embalmed. He found multiple contusions and bruises on the face, abdomen and back; multiple contusions and lacerations to both lungs, with blood in both cavities, concluded by him to have been caused by some kind of trauma—external injury. He found contusions of the trachea and esophagus caused by a trauma—a blow; the diaphragm muscle and the heart were contused; the abdomen was distended because of blood in the abdominal cavity, which could not have been caused by injury 4 or 5 days before the child died. The appendix was contused along the right colon; there was hemorrhage in the fat of the right kidney and in the adrenal glands, caused by trauma. There was a fracture of the ninth rib posteriorly; a contusion of the soft tissues of the scalp, but no fracture; and there were brain contusions of the right frontal lobe and the left temporoparietal lobe. All of the injuries Dr. Samoza found were testified by

him to have been very recent, and he gave as the cause of death: multiple internal bleeding.

■ Although the submissibility of the state's case is not challenged, the foregoing facts are sufficient for the jury to have found, as it did, appellant's guilt.

At trial appellant testified that when he prepared the child for bed and found he had diarrhea he cleaned him and spanked him a couple of times, and the child was crying. He put him to bed, closed the door, and heard the child coughing and trying to catch his breath. He sat the child up in bed and tried to calm him down as he was having trouble catching his breath, so appellant slapped him a couple of times in the face, which did not do any good. "[T]hen I laid him on the floor and started to give him mouth to mouth." It was not doing any good. He started vomiting in his mouth, "so I started pressing on his stomach and his abdomen." He turned the child on his back and started pressing on his back and stomach. The child did not respond and appellant was getting panicky and hysterical, so appellant took him the mile and a half to the hospital.

In explaining his statement (the confession) to the officers that when he was applying artificial respiration by pushing on the child's abdomen and chest he got carried away; that he could not help himself; and that he could not stop, appellant testified that he told officers that he was panicky and hysterical; he was trying to revive the child and did not seem to be doing any good; and that he just kept trying. He testified that the officers did not put the explanation down in the statement.

A portion of appellant's contention that the court erred in receiving evidence of other crimes relate to testimony of the officer who read appellant's statement into evidence, to cross-examination of appellant, and to cross-examination of appellant's wife, and direct examination of a rebuttal witness, all concerning punishment and beatings of the child administered by appellant to him. The portions of the statement are:

"Q. Allen, have you ever lost control of your temper on other occasions when you have been administering punishment to William Michael? A. One other time when I was spanking him with a newspaper I got carried away. * * * Q. Is there anything else you wish to add to this statement? A. I know that I need help. I don't know why I lose control of myself. I just can't help it. I went to a psychiatrist about four years ago when I was married to my first wife because of this same thing and he told me I was okay after I went to see him for three or four times. I am sorry this happened. I didn't mean for it to. I know that I need help." An objection to the reading of the entire statement was at first withdrawn, but counsel later interjected an objection to the quoted portions of the evidence upon the ground that they impermissibly interjected an issue of other crimes.

■ The contents of appellant's statement, as it relates to his administering punishment *to this child,* do not come within the prohibition of evidence of other crimes mentioned as the general rule in State v. Shilkett, 356 Mo. 1081, 204 S.W. 2d 920 (1947); State v. Reese, 364 Mo. 1221, 274 S.W.2d 304, 307 (1954); and State v. Reed, 447 S.W.2d 533, 534 (Mo. 1969), "unless such proof has some legitimate tendency to directly establish the defendant's guilt of the charge for which he is on trial." With the exception of the reference in appellant's statement that he went to a psychiatrist four years ago when he was married to his first wife because of this same thing (which on retrial should be excluded as having a possible and impermissible reference to crimes committed on other persons, if proper objection is made), the statement has reference to appellant's intent and the absence of mistake or accident which is one of the exceptions to the general rule in State v. Reese, supra. See State v. Hepperman, 349 Mo. 681, 162 S.W.

2d 878 (1942) (evidence of arsenic poisoning of a daughter who became ill, held admissible to negative accident or mistake, where the charge was that of death by arsenic poisoning of the victim in homicide); State v. Hill, 273 Mo. 329, 201 S.W. 58 (1918) (evidence admissible of a prior poison attempt on the victim); see the discussion in State v. Hyde, 234 Mo. 200, 136 S.W. 316, 324, 325 (1911); 29 Am.Jur. 2d Evidence, § 323, p. 374; 22A C.J.S. Criminal Law, § 683, p. 741; and note the statement of the rule, Wigmore on Evidence, 3rd Ed., § 363, p. 275: "The *Intent* principle (*ante*, § 302) receives constant application; for the intent to' kill is in homicide practically always in issue, and is to be proved by the prosecution, and the recurrence of other acts of the sort tends to negative inadvertence, defensive purpose, or any other form of innocent intent. For this purpose, therefore, the evidence is receivable irrespective of whether the act charged is itself conceded or not. Where (as usually) it is not conceded, the evidence of intent goes to the jury to be used by them only on the assumption that they find the act to have been done by the accused; it is then to be employed by them in determining the intent." In this case evidence of similar acts of striking this child are admissible, as contained in appellant's statement (with the exception of the portion above noted) which statement will undoubtedly be offered in evidence upon re-trial. It is unknown whether on re-trial appellant will testify and thus be subject to cross-examination; or whether his wife will testify and be subject to cross-examination and impeachment by a rebuttal witness. In any event the scope of inquiry should be carefully limited to the subject of appellant's prior treatment of this child, as the testimony may indicate.

■ Appellant complains of the admission into evidence of 12 color photographs of the child showing, in various views, its condition after death. It is said that the sole purpose of the photographs, of a highly inflammatory nature, was to so inflame the passions of the jury as to create prejudice to appellant. The photographs showed the nature, extent and location of the bruises, lacerations and contusions upon the child, which the jury could find were greater than those which might have been incurred by reason of appellant's giving the child artificial respiration, which was the version of how the injuries occurred. State v. Floyd, 360 S.W.2d 630 (Mo.1962), is for the foregoing reason, distinguishable. See Annotations, 159 A.L.R. 1413; 73 A.L.R.2d 769; State v. Crawford, 416 S.W. 2d 178, 187[10] (Mo.1967), and cases cited. These photographs were relevant to the issues of the extent and nature of the wounds and to the cause of death. Appellant's contention in this respect are ruled against him.

The improper and prejudicial matter for which this case is reversed and remanded for new trial occurred in this manner: After appellant testified but before his witnesses as to his good reputation were put on the stand, appellant's wife was cross-examined: "Q. Do you deny ever telling any person that this man picked up a cat and threw it against the wall and killed it?" Out of the hearing of the jury a request was made that the jury be instructed to disregard the matter, and for a mistrial. During the ensuing colloquy, the state told the court that it had a right to show the temperament of appellant, and appellant's counsel stated that the offense of killing a cat or a dog is by statute a crime. [See § 563.670, RSMo 1969.] The court overruled the motion for mistrial and the objection, stating that it was letting the state go ahead because of the statement to the police that appellant lost control of himself, and it showed his temperament.

■ In State v. Lapage, 57 N.H. 245, 289 (1876), the rules were stated: "1. It is not permitted to the prosecution to attack the character of the prisoner, unless he first puts that in issue by offering evidence of his good character. 2. It is not permitted to show the defendant's bad character by showing particular acts. 3.

It is not permitted to show in the prisoner *a tendency or disposition to commit the crime with which he is charged.* 4. It is not permitted to give in evidence other crimes of the prisoner, unless they are so connected by circumstances with the particular crime in issue as that the proof of one fact with its circumstances has some bearing upon the issue on trial other than such as is expressed in the foregoing three propositions." (Italics added.)

The rationale, in part, of the foregoing propositions appears in the recent and analogous case of State v. Earvin, 510 S.W.2d 419 (Mo.1974). There the state was permitted to cross-examine defendant about a prior incident allegedly involving an altercation over defendant's losing a bet and in which defendant threatened a third person, Weaver, with a meat cleaver. The state's theory was that the matter was not collateral to the charge and the defense of self-defense, " 'I can show by prior act of a similar nature that this man is prone to, when he loses a bet, to be vicious and go after the person he loses to. * * * We can show that on a previous occasion he did a similar thing over the same type of a thing, losing a bet.' " Defendant denied that there was an argument and that he threatened anyone with a meat cleaver. His evidence of good reputation was received, and on rebuttal, over objection, the state presented testimony as to the prior incident. The admission of that testimony was held to be reversible error because it had no probative value as to defendant's state of mind at the time of the killing; it was not admissible to impeach defendant as a witness because it related to a collateral matter; and it did not counter defendant's evidence of his good reputation because it tended to prove specific acts of misbehavior. The exclusionary rule of State v. Maddox, 339 Mo. 840, 98 S.W.2d 535 (1936), and other cited cases should have been applied. See also State v. Sanders, 360 S.W.2d 722, 725 (Mo.1962), where it is said. "It has been held that a witness may not be cross-examined as to a collateral matter for the purpose of impeaching his testimony later by contradicting him."

Even if there had been proof of the act encompassed in the question, it would not have been admissible because it was entirely collateral to the inquiry as to appellant's intent. Several cases from other jurisdictions bear on the question. In Pittman v. United States, 42 F.2d 793, 797 (CA 8th 1930), it was said, "[C]ross-examination should not be permitted to be used to covertly convey to the minds of jurors suspicion and prejudice as to a defendant by a recital as facts of supposed matters not appearing in the evidence and wholly outside of the case." In People v. Blockburger, 354 Ill. 301, 188 N.E. 440 (1933), the prosecutor, in cross-examination of defendant, inferred that he had been engaged in some nefarious transactions in St. Louis some 30 years previous to trial. At 188 N.E. 444[3–5], the court quoted Russell on Crimes (Vol. 2, p. 772), " 'No evidence can be admitted which does not tend to prove or disprove the issue joined. In criminal proceedings the necessity is stronger, if possible, than in civil, of strictly enforcing the rule that the evidence is to be confined to the point in issue. It is therefore a general rule that the facts proved must be strictly relevant to the particular charge, and have no reference to any conduct of the prisoner unconnected with such charge.' " The court went on: "This court has repeatedly held that attempts to present matters before a jury which are not properly admissible in evidence, for the purpose of prejudicing the jury against the defendant, constitute prejudicial error. (Citing cases.) It is impossible for us to say on this record that the plaintiff in error was not prejudiced or injured by the matters hereinabove set forth, either upon the question of his guilt or innocence or upon the amount of punishment given him." It was held to be reversible error where the prosecution, upon cross-examination, under the guise of testing the credibility of the witnesses, was permitted to indulge in a

wide range of insinuating questions in Black v. Commonwealth, 240 Ky. 620, 42 S.W.2d 883 (App.1931). In Commonwealth v. Beck, 122 Pa.Super. 123, 184 A. 761, 764 (1936), a conviction was reversed where the court permitted cross-examination of a character witness if he had heard defendant was living with a woman other than his wife. The court quoted Commonwealth v. Colandro, 231 Pa. 343, 80 A. 571, 576 (1911), " 'The· practical effect of such cross-examination may well have been to brand the defendant as a bad man, and to cause the jurors to approach a consideration of his defense from that standpoint, or at least to raise doubts in their minds in passing upon his character evidence.' " See also Cook v. State, 36 Okl.Cr. 285, 253 P. 1029 (1927); McNaulty v. State, 138 Tex.Cr.R. 317, 135 S.W.2d 987, 988 (1939); People v. Page, 365 Ill. 524, 6 N.E.2d 845, 847[2–5] (1937); State v. Bur-

ris, 194 Iowa 628, 190 N.W. 38 (1922); and State v. Steensen, 35 N.J.Super. 103, 113 A.2d 203, 206[9] (1955).

■ The state, although conceding that the matter was improper, urges that by reason of the overwhelming evidence of appellant's guilt, it was harmless error. The rule of harmless error cannot here apply because it cannot be said with any degree of certainty that the improper insinuation of the question put to appellant's wife did not influence the jury either in considering appellant's guilt, his defense of accident, or the matter of his punishment. Wynn; Blockburger; Beck; and Page, supra.

The judgment is reversed and the case is remanded for new trial.

All concur.