**STATE of Missouri, Respondent,**

v.

**Leo Grant MILLIGAN, Appellant.**

**No. WD 33019.**

Missouri Court of Appeals,
Western District.

May 17, 1983.

Motion for Rehearing and/or Transfer to Supreme Court Overruled and Denied June 28, 1983.

Robert G. Duncan, Gladstone, for appellant.

John Ashcroft, Atty. Gen., Theodore A. Bruce, Asst. Atty. Gen., Jefferson City, for respondent.

Before TURNAGE, P.J., and PRITCHARD and KENNEDY, JJ.

TURNAGE, Presiding Judge.

Leo Milligan was found guilty by a jury of second degree murder for the killing of Charles Reno. In accordance with the jury's verdict, the court sentenced Milligan to life imprisonment. This court has jurisdiction. *State v. Martin*, 644 S.W.2d 359 (Mo. banc 1983).

On this appeal, Milligan contends that the evidence was insufficient to sustain the conviction, that the court erred in admitting evidence of his conduct when drunk, and that he was entitled to have the charge dismissed because he was not brought to trial within 180 days. Reversed and remanded.

Reno was a 95 year old retired farmer and auctioneer who lived alone on a farm near the small settlement of Tennis Grove, in Ray County, Missouri. Although Reno was in fairly good health, he walked with two canes, apparently because he was a large man. Close neighbors checked on Reno almost daily and did much of his grocery shopping.

Milligan lived in the same general area but a few miles from the Reno farm. Milligan farmed, did some auctioneer work, and operated a bulldozer.

Between 9:00 and 10:00 a.m. on March 20, 1980, Don Coats, a neighbor of Reno, stopped at Reno's house and gave him a piece of pie. Coats stated that at that time Reno appeared to be in a normal condition. At about 4:45 p.m. on the same day, Raymond Woods observed Milligan driving his pickup truck northbound a short ways from and in the direction of the Reno home. Woods recalled that his windshield wipers were operating because the roads were wet.

At about 5:45 p.m. on the same day, Norman Burns, who farmed Reno's land and lived nearby, was returning from his job in Braymer when he observed Milligan's pickup truck parked in Reno's driveway near the gate leading to the yard around the house. There was evidence that while Reno and Milligan were acquainted, no one had seen Milligan's truck at Reno's house prior to March 20, and no one was aware

that the two had previously visited each other.

When Burns went to work at about 7:00 a.m. on the next morning, March 21, he observed Milligan's truck still in the same place. After reaching his home Burns tried to call Reno because his suspicion had been aroused by the continued presence of Milligan's truck in the Reno driveway for such a lengthy time. When Burns received no answer from Reno, he called the owner of a nearby country store, who suggested that Burns go check on Reno. After this conversation the owner of the store called Don Coats.

Burns went to the Reno home, and upon looking in the truck, he observed Reno's body stuffed on the floorboard between the dash and seat on the passenger side. Burns went to the country store where he met Coats and the sheriff was called. Burns and Coats returned to the Milligan truck and they removed the billfold protruding from Reno's pocket and took it to the store. They returned to the truck and met the sheriff when he arrived shortly thereafter. Police evidence technicians from Kansas City also arrived at the scene.

Reno's two canes were found on the ground near the truck, together with an envelope addressed to Milligan, and a pair of glasses which were identified to be similar to those worn by Milligan. There was other mail addressed to Milligan lying near the canes which had blood on it.

In the front seat of the pickup there was trash, newspapers, more of Milligan's mail, and a sack with a 6 or 12 pack of beer. Reno's boots were sitting on the floor on the driver's side. A flap from a pair of coveralls was stuck to the bottom of one of the boots by a substance which had the appearance of blood. On top of Reno's body was an empty beer can with fingerprints which were later determined to belong to Milligan. Under Reno's body there were tools, two caps, and a set of keys. When the keys were inserted into the ignition of the truck the engine started and the windshield wipers and defroster came on.

There was evidence that Reno's wife had been dead a number of years, and that since her death he had made no effort to keep the house clean with the result it was littered with all kinds of trash. Reno slept on a couch in the front room, and when a cover was removed from the couch after the body was found, a whiskey bottle rolled out. It was later determined that Milligan's fingerprints were on that bottle. There was other evidence that Milligan had purchased a bottle of whiskey of the same brand on March 20. Additional evidence indicated that the bottle appeared to be clean in contrast to the filthy condition of the other trash found in the room. There was evidence that it had rained on March 20 and probably on Friday morning, the 21st. There was fairly fresh mud on the tail pipe and wheels of the pickup. Mud had dripped down from the truck and this mud had not been disturbed by any movement of the truck. Except for Highway A all of the roads in the area are either gravel or dirt. There was no sign of any scuffle in the house or on the ground near the truck.

An autopsy was performed on Reno. There were numerous fractures, bruises, and lacerations found on the body. Those included multiple fractures of the left leg, at the knee, and above the knee. He also had a fracture of the ribs, a fracture of the right arm, and of the little finger of the right hand. There were also possible fractures of the vertebrae. There was a very severe wound on the right side of the face and numerous lacerations and bruises. There were no gunshot or stab wounds. The pathologist who performed the autopsy stated that death was due to heart and lung failure secondary to violent injury to the body. He said that in his opinion Reno was in the truck 2 to 3 hours before he died and that his position in the truck restricted his breathing and had caused fluid to build up in his lungs. He stated that at the time of the autopsy at 3:00 p.m. on March 22, Reno had been dead for more than 24 hours. He further stated that the injuries were caused by a blunt mechanical object which struck Reno with tremendous force.

When the body was removed from the truck at about 11:15 p.m. on March 21, Dale Trigg, an evidence technician from the Kansas City, Missouri, Police Department, testified there was no rigor mortis present. He stated that rigor mortis generally leaves a body within 24 to 36 hours after death.

Trooper Baird of the highway patrol interviewed Milligan. He stated that Milligan told him that he arrived at his home between 10:00 p.m. and midnight on March 20 and parked his pickup at the end of the driveway because it was muddy. He said he left his keys and cap in the truck and probably his reading glasses and mail. During the interview Milligan was wearing coveralls and the trooper noticed a pocket flap missing. Milligan agreed that the trooper could take his coveralls and it was later determined the missing flap was the flap found stuck to the bottom of one of Reno's boots. It was stipulated that the flap had only recently been torn from the coveralls. Also during the interview, the trooper noticed that Milligan had an injury to his eye. Later examination revealed small specks of human blood on the coveralls, but they were too small to test for blood type.

A housekeeper who lived in Milligan's mobile home, although in a separate bedroom, stated that when she went out early on the morning of March 21 she noticed that Milligan's truck was not in the driveway, although she had observed Milligan asleep on a couch in the front room. She testified that Milligan was not home when she had gone to bed about 9:00 p.m. on March 20, but when she got up between midnight and 2:00 a.m., she observed he was sleeping on the divan. She testified that she awoke Milligan when she discovered the truck was not there and told him. After Milligan talked to relatives, apparently to see if they had his truck, he called the sheriff, and reported the truck stolen.

Milligan also told the trooper he could not recall anything that happened between 5:00 and 10:00 p.m. on the night of March 20.

Other evidence indicated Milligan had been drinking during the day of March 20.

Milligan first contends that the evidence was insufficient to support a finding of guilt by a jury. The evidence in this case was of course circumstantial and the rule regarding review in a circumstantial evidence case is well known. The facts and all favorable inferences which can be reasonably drawn therefrom must be considered in the light most favorable to the state and all evidence and inferences to the contrary must be disregarded. *State v. Franco,* 544 S.W.2d 533, 534[1–4] (Mo. banc 1976). Further:

> [w]hen the state's case rests upon circumstantial evidence, "the facts and circumstances must be consistent with each other and with the hypothesis of defendant's guilt, and they must be inconsistent with his innocence and exclude every reasonable hypothesis of his innocence."

From the evidence set out above, the jury could have reasonably found that Milligan's truck appeared in Reno's driveway between 4:45 and 5:45 p.m. on March 20 when Milligan was in possession thereof, because he had been seen driving the truck just a short distance from Reno's house at that time. The jury could also have found that the truck did not move from that time until the body was removed about 11:30 p.m. on March 21. The jury could have found that Reno had been dead from 24 to 36 hours at the time his body was removed which would have placed the time of death between 11:30 a.m. and 11:30 p.m. on March 20. The jury could have reasonably inferred that the beer can containing Milligan's fingerprints was placed on Reno's body after the body had been placed in the truck because of the position of the body and the rather precarious location of the can. The jury could have also found that Milligan had been in Reno's house from the whiskey bottle found under the cover on the divan where Reno slept bearing Milligan's fingerprints.[1] The jury could thus have inferred that the prints were impressed on the beer can at the time of the murder. This has

1. There was evidence that Reno did not drink nor had any liquor been observed in his house.

been held sufficient to support a conviction. *State v. Thomas,* 452 S.W.2d 160, 163 (Mo. 1970). In addition the flap from Milligan's coveralls could be found to have been torn off and become stuck to Reno's boot during the course of the murder.

The jury could have also inferred that the reason that the truck was left in Reno's driveway was that Milligan could not locate the keys because they had become lodged under Reno's body and thus were not readily observable.[2]

Considering the evidence in the light most favorable to the state, this court concludes that there was sufficient circumstantial evidence to support the jury's verdict.

■ Milligan next contends that his motion to dismiss based on the speedy trial statute, § 545.780 RSMo 1978, should have been sustained because he was not brought to trial within 180 days after his arraignment. Milligan's first trial began 203 days after his arraignment and resulted in a hung jury. Prior to the first trial Milligan had disqualified the circuit judge of Ray County, and filed an application for a change of venue. The case was transferred to Platte County, but on agreement of the parties, the trial was transferred to Cooper County. In denying the motion to dismiss on the ground that he had not been brought to trial within 180 days, the court noted the pretrial motions which Milligan had filed and found that the 23 days delay which exceeded the 180 days allowed by statute was attributable to the motions filed by Milligan. In a similar situation, this court in *State v. Ratliff,* 633 S.W.2d 267, 270[3] (Mo.App.1982), held that the initial burden is on the defendant to show that the state was responsible for the delay when there are pretrial motions filed by the defendant. This court further held that if the proof fails to demonstrate that the state caused or contributed to the delay in disposing of the motions, or if the delay were a normal

and reasonable period necessary to disposition of the motions, then the delay was not occasioned by the state and the defendant is not entitled to relief. Further, it should be observed that § 545.780.3(1)(d), (e) provides that delay resulting from a change of venue and delay reasonably attributable to any period, not to exceed 30 days, during which any proceeding concerning the defendant is actually under advisement, is to be excluded in computing the time in which trial must begin. Excluding 30 days for disposition of the motions filed by Milligan results in the trial being held within 180 days.

■ Milligan finally contends that the court committed prejudicial error when it allowed testimony over objection that when drunk, he became extremely violent. A number of witnesses were asked if they knew Milligan drank and his conduct while drinking. Most of the objections were sustained and when answers were given the jury was instructed to disregard them. However, the court allowed Burns to testify, over objection, that when drinking Milligan was mouthy, pushy, and wanting to fight everyone. Raymond Woods was also allowed to testify, over objection, that Milligan did not act normal when drinking. Trooper Baird was allowed to testify, over objection, that he had seen Milligan drunk about two years before the trial and Milligan was acting extremely violent at that time. The objection at trial was that the evidence of Milligan's conduct when he was drinking was immaterial, irrelevant, and constituted an attack on Milligan's character. Milligan contends that the attack on his character or reputation was improper because it came prior to any evidence being offered by Milligan as to his good character. It is well settled that reputation or character testimony is admissible only when the defendant has put his own reputation in issue. *State v. Johnson,* 496 S.W.2d 852, 857[6, 7] (Mo.1973).

---

**2.** Although the state was not required to prove a motive, there was evidence that Milligan was in need of money, at least $1000, to pay on a bank loan. There was evidence that Reno was known to have money. Even so, there was

about $150 in Reno's billfold when it was removed by Burns and Coats which was the amount they testified Reno generally carried on his person.

This case is similar to *State v. Thurman,* 521 S.W.2d 773 (Mo.App.1975), in which Thurman was convicted of manslaughter for the killing of a small child. The trial court admitted evidence that at one time Thurman had thrown a cat against a wall and killed it. This court quoted with approval *State v. Lapage,* 57 N.H. 245, 289 (1876), that the prosecution may not attack the character of the person unless he first puts his character in issue by offering evidence of good character and it is not permitted to show that the defendant has a tendency or disposition to commit the crime of which he is charged. The state in this case was obviously trying to impress the jury with the fact that Milligan was known to drink and that his reputation when drinking was of violent and mean conduct. The theory apparently was to convince the jury that because the crime here was one of a violent nature then Milligan was thereby guilty. In *Thurman,* this court noted the rule at page 778[8] that no evidence should be admitted which does not tend to prove or disprove the issue joined. The evidence introduced of the violent nature of Milligan when drinking did not tend to prove or disprove whether or not he killed Reno. That issue necessarily rested on the circumstantial evidence which the state introduced to connect Milligan to that crime. The evidence of his violent nature when drinking introduced a purely collateral issue.[3] In *Thurman,* the introduction of such collateral issue by showing a violent nature in his treatment of the cat was held to be prejudicial. This court held that it could not be said with any degree of certainty that the tainted evidence did not influence the jury.

The same situation exists in this case. It cannot be said that the evidence that Milligan was violent when drinking did not influence the jury even though such evidence was not relevant or material to the issue to be decided by the jury.

The state seeks to justify the reception of such evidence by relying on *State v. Todd,* 342 Mo. 601, 116 S.W.2d 113 (Mo.1938). The holding in *Todd* was restricted to the propriety of admitting evidence that Todd was drinking at the time that he shot his son. Although the court noted there was evidence that Todd was inclined to be violent while under the influence of liquor, that evidence was apparently not challenged because the court held specifically only that evidence of whether or not he was intoxicated at the time of the shooting was competent. *Id.* 116 S.W.2d at 117. Here Milligan contends the evidence of his violent nature while drinking was an impermissible attack on his character or reputation when he had not put his character or reputation in issue by introducing evidence that it was good. Based on *Thurman,* this court finds that such evidence was inadmissible and prejudicial.

The judgment is reversed, and this case is remanded for a new trial.

All concur.

---

**3.** It should further be observed that the evidence introduced by the state related only to specific acts by Milligan while drinking and not to his reputation. *Thurman,* at 778, pointed out specific acts of misbehavior are not admissible.