STATE of Missouri, Plaintiff–
Respondent,

v.

Leon WILLIAMS, Jr., Defendant–
Appellant.

No. 18241.

Missouri Court of Appeals,
Southern District,
Division Two.

Oct. 13, 1993.

Motion for Rehearing or Transfer
Denied Nov. 4, 1993.

Application to Transfer Denied
Dec. 21, 1993.

Roy W. Brown, Bruce B. Brown, Kearney, for defendant-appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Hugh L. Marshall, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

FLANIGAN, Presiding Judge.

A jury found defendant Leon Williams, Jr., guilty of murder in the second degree, § 565.021,[1] and he was sentenced to life imprisonment. The victim was defendant's three-year-old stepson, Justin Minogue. Defendant appeals.

In general, defendant contends: (1) There was a prejudicial variance between the offense charged in the information and the offense as submitted in Instruction 5, the verdict-directing instruction; (2) the trial court erred in admitting evidence of defendant's prior mistreatment of Justin and in giving Instruction 9 dealing with that subject; (3) the prosecutor's closing argument was prejudicially erroneous in several particulars.

In addition to its formal portions, the information charged that defendant committed the class A felony of murder in the second degree, "in that on or about March 9, 1990, in the County of Oregon, State of Missouri, the defendant with the purpose of causing serious physical injury to Justin Michael Minogue, d.o.b. 7/28/86, caused the death of Justin Michael Minogue by striking him in the abdomen."

Defendant does not challenge the sufficiency of the evidence to support the conviction. In light of defendant's contentions on appeal, the following portions of the trial testimony are set forth:

### State's Witnesses

Tom Clary: I am a funeral director-embalmer at Alton; in the early hours of March 9, 1990, I received a telephone call from defendant's father to come to his house, and my father and I went there; my father is the coroner; Justin's body was lying, fully clothed, on a sofa; we took Justin to the funeral home and undressed him; Justin was bruised from head to toe; we returned to the Williams house and told defendant's father that an autopsy was necessary; my father quizzed defendant about the bruises on Justin's body; my father asked defendant if he had disciplined Justin, and defendant said that he did with his hand; we notified the chief of police, the sheriff, the juvenile officer, and a pathologist; the death certificate of Justin, state's Exhibit 9, says: "The cause of death is blunt trauma of the abdomen, which is due to blunt soft tissue trauma, and peritonitis caused by a blow to the abdomen"; Exhibits 1 through 8 are photographs of Justin's body.

1. All references to statutes are to RSMo 1986, V.A.M.S., and, unless otherwise indicated, all references to rules are to Missouri Rules of Court, V.A.M.R.

Allen Paris, M.D.: I am a physician and pathologist; on March 9, 1990, I performed an autopsy on Justin Minogue at the request of the coroner; the most striking feature was obvious immediately—extensive bruises and abrasions over large areas of the body; I have autopsied several children in the past for SIDS death, and none of them have ever had bruises before or any suspicious markings; this one was shocking from the first observation; there were dramatic lesions on both buttocks, two large abrasions surrounded by large areas of bruising that had the shape appearance of a belt; there were 15 scarred areas on the back along the line of the spinal column suggestive of cigarette burns; there was a hole in the intestinal wall in the mid-portion of the small intestine; I found no sign of bruising that would indicate that the perforation was due to trauma of the abdomen; "I had what was visually a child who had been beaten"; the death was caused by intraperitoneal sepsis, which was secondary to intestinal laceration, which was secondary to blunt trauma to the abdomen; blunt trauma is a blow; the time between the rupture of the bowel and the time of death was a period of at least 6 hours and at most 48 hours.

Fred Lang: I am a funeral director and handled the service; I saw Justin's upper chest, neck, and face; I couldn't believe what the guy looked like.

John Minogue: I am Justin's uncle and I was around Justin his whole life; in June or July 1989, I took Justin to the bathroom and pulled up his shirt; there were marks across his back; I pulled down his pants and his underwear and there were more bruises on his butt; this concerned me; I told defendant I thought he was going a little bit hard on Justin; defendant said Justin was his son now and he would discipline him in any way he saw fit; I told defendant if I ever saw anything like that again I would "beat his ass."

Mary Minogue: I am Justin's mother; defendant and I were married on April 8, 1989, and we were divorced after this happened; I worked two jobs and was not home a lot; defendant disciplined Justin; defendant used his hand, spanking, and there were times defendant would smack Justin in the face; I tried to put a stop to it but it didn't do any good; I saw red marks on Justin's face and bruises on him; I saw marks that looked like belt marks; my brother John exhibited concern to me about Justin's well-being and I confronted defendant; defendant said that he didn't spank him that hard and . . . really I didn't get an explanation.

She further testified: On Halloween 1989, Justin was getting ready to go trick-or-treating and was wearing a clown costume; he had white makeup all over his face; after the trick-or-treating, I removed the white makeup and there were bruises on his face; I confronted defendant and defendant said, "Justin wouldn't eat and I smacked him"; in the early winter months of 1989, I saw bruises on Justin's legs and face and arm; I said something to defendant and he said, "I'm going to discipline him whether you like it or not"; in March 1990, we moved to Alton from Franklin County; defendant took Justin and my second son, Jordan, to Alton; Jordan was born December 27, 1989, to me and defendant; defendant took the boys to Alton on Saturday, and the following Thursday I got a call saying Justin was dead; Justin did not have any bruises on him when he left Franklin County with defendant; I went to Alton and asked defendant why Justin had died; defendant started crying and said he didn't do it; at the time of his death, Justin weighed 23 pounds and was 36 inches tall.

Shirley Ellis: I am an employee of the Division of Family Services; on June 15, 1989, I responded to a hot line call regarding defendant and his wife; I looked at Justin; there were bruises on his buttocks; I asked defendant how Justin got the bruises, and defendant said he had spanked Justin with a belt for wetting his pants; defendant said he had hit him two or three times and realized he had hit him too hard; defendant said he struck him three times with a belt and that "he was the master in his house and he would decide what was said and what was done in his house."

Mary Joan Minogue: Mary Minogue is my daughter; she and Justin lived with me for 2½ years and then she married defendant; in June or July 1989, I saw bruises and markings on Justin's body; he had bruises all over his little behind; I talked to defendant about the bruises and defendant said he spanked Justin harder than he realized; in December 1989, defendant took Justin into a bedroom; when Justin came back from the bedroom, his ear was all red; I notified my daughter.

Eva Jackson: Defendant is my ex-stepson; around May 1989, we were in a restaurant; Justin didn't want to eat and defendant took him to the restroom and spanked him; out in the restaurant we could hear Justin crying; I told defendant's father to go stop that, he's hitting him that hard and we can hear him out here; defendant's father didn't; I told defendant it wasn't necessary to whip that child that hard; later we went to the bar owned by defendant's father, which was closed; defendant and Justin and Mary went into the bedroom; defendant came out with a large cooking spoon in his hand; it was made of very hard material; I followed defendant into the kitchen and asked him if he had whipped Justin with that spoon; defendant didn't pay any attention; I went to the bedroom where Mary had Justin standing, putting his jammies on; his bottom was purple.

Doug Loring: I am a sergeant with the Highway Patrol; on March 15, 1990, I interviewed defendant after reading him his rights; during the interview I showed defendant photographs of Justin's body; defendant told me that on March 9, Justin ate some pizza and then vomited, and defendant sent Justin to the bathroom and made him stay; when Justin came out, he started to vomit again, and defendant sent him back the second time; he said he whipped Justin; defendant said he laid the boy across his knee and took a belt; he told me how he doubled it up and struck the boy three times; defendant said that his father definitely never touched Justin; defendant said he was the head of the household and that he took care of the discipline; I asked defendant about some tooth marks on Justin's left thigh and defendant admitted that he did bite the child but he didn't realize he bit hard enough to leave marks that night; defendant said that most of the marks shown in the photographs weren't on there when Justin was at his house; I said, "Are you accusing the funeral director of putting the marks on the body?" and defendant said, "Well, they wasn't on there when he left the house"; defendant said that Justin went to bed wearing underwear and a pair of socks; it was never explained to me how Justin had his clothes on when he was found by John Clary; after defendant looked at the photographs I said that things must have gotten out of hand and that he was hitting him harder than he thought, and all defendant said was he didn't hit him any harder but from the looks of the photographs that it was too hard; throughout the interview, defendant denied striking the boy with his fist and especially striking him in the stomach.

Mary Case, M.D.: I am a physician and forensic pathologist; on March 13, 1990, I conducted a post-mortem examination of Justin; my initial impression was that Justin was a child who received multiple blunt trauma externally to the body; I could count 89 separate marks of inflicted injuries; there were areas that could have been overlapping injuries and there could have been more; that is a very large number of impacts to a very small child; this is a three-year-old thin little boy; he had the appearance that he had been severely traumatized; 79 of the impact areas were bruises, one was a bite mark, several were abrasions; there was a laceration of the frenulum, which is pathognomonic of child abuse; it is an injury that we only see by inflicted injuries; it is not something that occurs accidentally; it is usually inflicted by slapping in the face; there were wound areas in the right upper extremity; there was an abrasion on the back of the forearm which could have been inflicted by a belt; on the right thigh and right leg there were loop mark pattern abrasions which could have been by a belt; Justin had a bite mark, quite significant of abusive injuries; the implication of a bite mark of that nature in a child

by an adult is that if you don't stop that abusive behavior that child will probably die of abuse; the bite mark and the torn frenulum are highly indicative of inflicted injuries; the multiplicity of marks on this child is quite overwhelming and indicative of very massive maltreatment of this child; the injuries were fresh, they were not present two or three days [before death]; their appearance was less than 24 hours, possibly less; Justin died as a result of blunt trauma applied to the abdomen which lacerated a portion of the small intestine; that allowed fecal material to flow out of the intestine into the peritoneal cavity, and that caused peritonitis; externally there were no marks of significance on the outside of the abdomen; that is not unusual; the fact that he had a very massive injury inside, without injury to the outside, in children that is very common; the majority of abdominal injuries will not have an external mark; there were other injuries around the intestine in the internal organs which support the blunt trauma force to the abdomen; there was a very significantly damaged mesentery, the fatty part of the intestine; it would have taken a significant force to have caused the laceration in the intestine and the hematoma of the mesentery; there were probably 12 to 24 hours between the time of the blow and Justin's death; Justin did not die of natural causes, nor as a result of accidental cause; the cause of death is laceration of the intestine from blunt trauma; someone struck with some part of their body or with other instrument, very forcefully, one or more times into the abdomen to cause that tearing of the intestine; this is an inflicted injury; this is abuse; I can't say who delivered the blow but it's a very closed population as to who had exposure to the child.

### Defendant's Evidence

Angelo Lapi, M.D.: I am a physician and pathologist; without viewing the body or the viscera, I could not say with reasonable medical certainty that this death was caused only by a blunt instrument striking the abdomen and lacerating the intestines; I cannot say with reasonable medical certainty, absolutely,

that the cause of this baby's death was blunt trauma to the abdomen; I agree that peritonitis caused the death; I have seen the photographs of Justin on the autopsy table and the abrasions and bruises on his body; those bruises, cuts, abrasions, and lacerations are consistent with trauma; I think that Justin was an abused child.

Leon Williams, Sr.: I am defendant's father; on the evening of March 8, Justin took two bites of pizza and he threw up; defendant put Justin in the bathroom and said, "Go in the bathroom, Justin, and finish throwing up, because I know you are going to"; the next day I told Officer Gale that Justin got a spanking last night and defendant said he did it; I never laid a hand on Justin or disciplined him; the only people staying at my residence were me, defendant, and the two children; Justin was in the care of defendant.

Leon Williams, Jr.: I never hit that boy in the belly; I did not kill my little boy; in June 1989, I did whip Justin and caused the bruise on his rear-end; I told Shirley Ellis, "I am the ruler and master of this house"; I have never beat on my son, I have whipped him; when Justin's body was removed from my father's house, there were no marks on his body; the Bible says, "and you shall take a rod, and you shall beat your child and you shall deliver his soul from hell"; nowadays you spank your child's butt and that's called child abuse.

■ Defendant's first point is that the trial court erred in giving Instruction 5 because there was a variance between the information and the instruction. The information charged that the defendant "caused the death of [Justin] by striking him in the abdomen." Instruction 5 submitted that "the defendant caused the death of [Justin] by striking him." Defendant contends that the omission of the words "in the abdomen" in Instruction 5 constituted a material and prejudicial variance.

Defendant concedes that his first point has not been preserved for appellate review be-

cause the challenge to Instruction 5 was not presented to the trial court at the trial or in defendant's motion for new trial. To preserve the error for review, any specific objections to an instruction which were not made at the trial before submission to the jury must be set forth in a motion for new trial. Rule 29.11(d). This court, in its discretion, reviews defendant's first point for possible plain error. Rule 29.12(b). Plain error requires a finding by this court that manifest injustice or miscarriage of justice has resulted therefrom. *Id.*

■■■ A person may not be "charged with one offense, or with one form of an offense, and convicted of another." *State v. Lee*, 841 S.W.2d 648, 650 (Mo. banc 1992). When a crime may be committed by any of several methods, the method submitted in the verdict-directing instruction must be among those alleged in the information. A variance alone is not conclusive to the question of whether there is reversible error. To justify reversal, a variance must be material and prejudicial to the rights of the accused. *Id.* A variance is material if it affects whether the defendant received adequate notice from the information, but a material variance is not always prejudicial. A variance is prejudicial only if it affects the defendant's ability adequately to defend against the charge presented in the information and given to the jury in the instruction. *Id.* Even if a variance exists, it is not reversible unless a charge, new and distinct from the offense alleged in the information, is submitted to the jury. *State v. Brigman*, 784 S.W.2d 217, 222[12] (Mo.App.1989); *State v. King*, 747 S.W.2d 264, 275 (Mo.App.1988).

Section 565.021 reads, in pertinent part:

"1. A person commits the crime of murder in the second degree if he:

(1) Knowingly causes the death of another person or, with the purpose of causing serious physical injury to another person, causes the death of another person; or"

The information, set forth in the third paragraph of this opinion, charged that defendant "with the purpose of causing serious physical injury to [Justin] caused the death of [Justin] by striking him in the abdomen." MACH–CR 13.04 [1984 New] is the form approved by the Supreme Court of Missouri for charging murder in the second degree as defined in § 565.021.1(1). The form is deemed to comply with Rule 23.01 which sets forth the requirements for the contents of an information. See Rule 23.01(e). The information could have omitted the phrase "in the abdomen" and still have satisfied MACH–CR 13.04. The phrase was surplusage.

Instruction 5 was based on MAI–CR 3d 313.04 [Murder in the Second Degree: Conventional]. Defendant makes no claim that Instruction 5 deviated from the approved instruction or that Instruction 5 was not supported by the evidence.

Defendant argues:

[T]he cause of death and the location of the fatal blow—by striking in the abdomen—is an essential element of the crime.... [B]y not limiting the trauma to the abdomen, the jury could have rejected the State's theory that the rupture to the small intestine was caused by a severe blow with a blunt object, but still convicted [defendant] based upon all of the various types of trauma.... [Defendant] has the right to demand the nature and accusation against him and to require the State to prove its theory of death and the jury to find the necessary nexus between the cause of death and the alleged severe trauma to the abdomen. Reversible error exists because the jury had a roving commission as to the cause of death element, which in turn permitted the jury to find that [defendant] had a purpose to cause serious physical injury. The jury simply was not instructed on the "constitutive facts of the offense charged" and may have found him guilty based upon acts which did not constitute the crime charged.

Authorities do not always agree on a precise definition of "variance." In *U.S. v. McMahon*, 861 F.2d 8, 12 (1st Cir.1988), the court said: "A variance occurs when the facts

proved at trial differ from those charged in the indictment." In *U.S. v. Homick,* 964 F.2d 899 (9th Cir.1992), the court said, at 907, that a variance occurs when the evidence at trial "proves facts materially different than those alleged in the indictment." Here there was no difference, material or otherwise, between the facts pleaded in the information and the state's evidence.

The surplusage in the information, consisting of the words "in the abdomen," was consistent with the state's proof as to the cause of death. That proof is found in the testimony of Allen Paris, M.D., the testimony of Mary Case, M.D., and in the death certificate, Exhibit 9, introduced through Tom Clary. The state introduced no evidence of an alternate cause of death.

Defendant is inaccurate in arguing that striking Justin in the abdomen was an element of the offense. Murder in the second degree is committed if the defendant, with the purpose of causing serious physical injury to another person, causes the death of another person. § 565.021.1(1). The statute does not prescribe the method by which death is caused nor the part of the victim's body to which the fatal agent may be directed.

The information gave the defendant adequate notice that the state would adduce proof that Justin's death was caused by a blow to the abdomen. Defendant's ability to defend adequately against the charge presented in the information was not impaired by the state's evidence. Instruction 5 fully apprised the jury of the facts they had to find beyond a reasonable doubt in order to return a finding of guilty. Defendant's defense at trial, if believed by the jury, was adequate to disprove the method alleged in the information and the conduct submitted in Instruction 5. Defendant was not charged with one offense, or with one form of an offense, and convicted of another. Defendant was charged with murder in the second degree, the state's proof was consistent with the charge including its surplusage, the jury was properly instructed on murder in the

second degree, and that offense was the basis of the conviction. There was no variance which was material and prejudicial to the rights of defendant. Defendant's first point has no merit.

Defendant's second point is that the trial court erred (a) in admitting, over defendant's objection, evidence of defendant's "alleged prior physical mistreatment" of Justin, and (b) in submitting Instruction 9.

■ Defendant argues that the evidence concerning his prior mistreatment of Justin, to be admissible, "must first be a crime under Missouri law." He further argues that even if the prior acts of misconduct constitute an offense, the prior conduct "is not sufficiently identical nor the methodology so unusual and distinctive to the charged crime that it resembles a signature of the defendant and his activities as such related to his past care and custody of Justin." Finally, he contends that "the evidence at most indicates that defendant used an open hand or belt, that the degree of injury never exceeded a physical injury as defined in § 556.061(20), and that such injury involved the face or buttocks but never the abdominal area." For the reasons which follow, this court rejects these arguments.

The evidence challenged by defendant consists of the May 1989 incidents described by Eva Jackson, the June 15, 1989, incident described by Shirley Ellis, the June or July 1989 and December 1989 incidents described by Mary Joan Minogue, and the Halloween 1989 incident described by Mary Minogue. Defendant relies primarily on *State v. Bernard,* 849 S.W.2d 10 (Mo. banc 1993).

In *Bernard,* a defendant was charged with sexual abuse and attempted forcible sodomy of a 14-year-old boy. The challenged evidence dealt with defendant's prior sexual misconduct directed at four other persons. In the case at bar, of course, the challenged evidence concerns prior misconduct directed toward the victim of the charged offense.

In *Bernard,* the court said, at 12–13:

The general rule concerning the admission of evidence of uncharged crimes,

wrongs, or acts is that evidence of prior uncharged misconduct is inadmissible for the purpose of showing the propensity of the defendant to commit such crimes. There are exceptions to the rule. Evidence of prior misconduct of the defendant, although not admissible to show propensity, is admissible if the evidence is logically relevant, in that it has some legitimate tendency to establish directly the accused's guilt of the charges for which he is on trial, and if the evidence is legally relevant, in that its probative value outweighs its prejudicial effect. The balancing of the effect and value of evidence rests within the sound discretion of the trial court.

Generally, evidence of other, uncharged misconduct has a legitimate tendency to prove the specific crime charged when it "tends to establish: (1) motive; (2) intent; (3) the absence of mistake or accident; (4) a common scheme or plan embracing the commission of two or more crimes so related to each other that proof of one tends to establish the other; [or] (5) the identity of the person charged with the commission of the crime on trial." The five enumerated exceptions have sometimes been difficult to define and apply. Evidence of prior misconduct that does not fall within one of the five enumerated exceptions may nevertheless be admissible if the evidence is logically and legally relevant.

In *Bernard*, the court adopted and applied a "signature modus-operandi/corroboration" exception to the rule prohibiting evidence of prior uncharged misconduct. The court held that portions of the challenged evidence were admissible and other portions were inadmissible under the newly created exception.

Many Missouri cases have upheld the admissibility, in cases of murder or assault, of prior misconduct of the defendant directed toward the victim of the offense on trial. They include: *State v. Bolden*, 494 S.W.2d 61 (Mo.1973); *State v. Lamborn*, 452 S.W.2d 216 (Mo.1970); *State v. Patterson*, 443 S.W.2d 104 (Mo. banc 1969); *State v. Pennington,*

124 Mo. 388, 27 S.W. 1106 (1894); *State v. Franklin*, 854 S.W.2d 55 (Mo.App.1993); *State v. Smith*, 791 S.W.2d 744 (Mo.App. 1990); *State v. Earvin*, 743 S.W.2d 125 (Mo. App.1988); *State v. Padberg*, 723 S.W.2d 43 (Mo.App.1986); *State v. Applegate*, 668 S.W.2d 624 (Mo.App.1984); *State v. Watson*, 607 S.W.2d 189 (Mo.App.1980); *State v. Letterman*, 603 S.W.2d 951 (Mo.App.1980); *State v. Cunningham*, 578 S.W.2d 341 (Mo. App.1979); *State v. Mattingly*, 573 S.W.2d 372 (Mo.App.1978); *State v. Helms*, 559 S.W.2d 587 (Mo.App.1977); *State v. Thurman*, 521 S.W.2d 773 (Mo.App.1975); *State v. Hudson*, 521 S.W.2d 43 (Mo.App.1975).

In *Bolden*, the defendant was charged with assault with intent to kill with malice aforethought. The victim was his wife. Testimony by the wife that defendant had broken her jaw more than one month prior to the offense on trial was admissible as tending to show "the intent and motive behind the present crime."

In *Lamborn*, defendant was convicted of second degree murder for the death of his six-year-old child. In affirming the conviction, the court took notice of evidence that defendant and the child did not get along and that defendant did not like the child.

In *Patterson*, defendant was convicted of assaulting a nine-year-old girl. Evidence of "prior beatings" of the victim by defendant was held admissible as tending to prove motive or intent.

In *Pennington*, cited with approval in *Patterson*, defendant was convicted of an assault with intent to kill his wife. The court held that evidence of a former or a subsequent assault made by defendant upon his wife was admissible to show his intent.

In *Franklin*, defendant was convicted of second degree murder of his three-year-old son. The court said that to find defendant guilty of second degree murder the jury had to believe beyond a reasonable doubt that defendant caused the child's death and that defendant intended to cause him serious physical injury. Examination of the victim's

body revealed multiple injuries, internally and externally. Death was due to a tear in the small intestine caused by a blunt impact to the abdomen. Defendant contended that the trial court erred in receiving evidence that the child was malnourished and claimed this allowed the jury to speculate he had intentionally starved the child. The court held that evidence of the malnourishment was probative of defendant's feelings for the child, was relevant as proof of defendant's general animosity toward him, and supported the inference that defendant intended to cause him serious physical injury. The court stated that evidence of other crimes is admissible if it is actually relevant to prove defendant's guilt of the offense on trial and not merely to show his bad character or his disposition to commit the crime.

In *Smith*, a shooting incident that occurred six months earlier between defendant and the murder victim was held admissible as showing defendant's culpable mental state and was not so remote in time that its prejudicial effect outweighed its probative value.

In *Earvin*, defendant was convicted of assaulting his ex-wife. Evidence of "prior assaults and bad acts" against the victim was held admissible and relevant to establish defendant's guilt.

In *Padberg*, defendant was convicted of second degree murder for the death of his ten-week-old son. The court held that evidence of prior mistreatment of a child was admissible in establishing the intent required for second degree murder and that "this is true where the prior mistreatment was recent and the evidence is that defendant was responsible."

In *Applegate*, defendant was convicted of second degree murder for the death of a two-year-old child. The court held that evidence that defendant had struck or kicked the child on prior occasions was admissible. The court said, at 631:

> In this case, the head injury, the external bruises and finally the vicious assault which resulted in the victim's death are

unequivocally part of a pattern, and evidence of other assaults upon the infant's person was relevant, admissible, and had a logical tendency to prove the defendant's guilt.

In *Watson*, defendant was convicted of assaulting her two-year-old son. The offense occurred on January 6, 1978. Evidence of defendant's mistreatment of the child in November 1976 was held admissible as tending to show that defendant purposefully engaged in physical abuse of the child in a pattern of what she apparently considered discipline and that the January 1978 injuries were not the result of accident.

In *Letterman*, defendant was convicted of second degree murder for the death of her one-year-old child. The death occurred on March 19, 1975. The evidence showed a series of interrelated assaults upon the victim, the last of which was fatal. The prior misconduct included scalding the victim. There was evidence that the injuries had been sustained over a period of one month prior to death.

In *Cunningham*, defendant was convicted of assault with intent to do great bodily harm with malice. Evidence of an assault by defendant upon the same victim two months prior to the offense on trial was admissible on the issue of intent and malice and tended to show a continued animus against the victim.

In *Mattingly*, defendant was convicted of second degree murder for the death of a one-year-old child. The court said that evidence of prior mistreatment of a child may be considered in establishing the intent required for second degree murder.

In *Helms*, defendant was convicted of second degree murder. Evidence of prior assaults by defendant upon the victim was held admissible as showing intent.

In *Thurman*, defendant was convicted of manslaughter for the death of a two-year-old child. The court held that evidence of defendant administering punishment on the victim was admissible on the issue of his intent and the absence of mistake or accident.

In *Hudson,* defendant was convicted of second degree murder for the death of an 18–month–old child. Evidence that defendant beat the child two months before its death was held admissible to prove intent and the absence of accident.

In *U.S. v. Leight,* 818 F.2d 1297 (7th Cir. 1987), the defendant was convicted of murder in the second degree for the death of her infant son Daniel. Evidence of injuries suffered by two other children of defendant was held admissible. Daniel's death occurred March 25, 1983. Defendant based her defense on the theory that Daniel's injuries and death were accidental. Evidence that defendant had physically abused her two other children in 1980 and 1981 was held admissible under Fed.R.Evid. 404(b), which reads:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that he acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident.

Defendant is wrong in asserting that the acts of prior misconduct must amount to a crime. In *Bernard, supra,* the court referred to "evidence of uncharged crimes, wrongs or acts." Similar language is found in Fed.R.Evid. 404(b), supra. See *State v. Kitson,* 817 S.W.2d 594, 597–598 (Mo.App. 1991). This is not to say that defendant's prior acts of misconduct were not criminal. Indeed, it is clear that at least some of them were.

The state's excellent brief contains, and the record supports, the following statement:

The evidence of prior injuries was also relevant to the issue of absence of mistake or accident. In his statement to police, defendant maintained that he had done nothing more than swat Justin three times with a belt. He claimed that injuries to Justin's head were the result of an accidental fall in the bathroom, and that bitemarks on Justin's thigh were the result of play that defendant did not realize was so rough. He ascribed Justin's other injuries to mishandling by the funeral director. During closing argument defendant suggested that the blow to Justin's abdomen could have been the result of accident.

In *State v. Coleman,* 857 S.W.2d 363 (Mo. App.1993), defendant contended that evidence of prior uncharged misconduct was too remote to be admissible. The uncharged misconduct occurred ten years prior to the offense on trial. Rejecting that argument, the court said, at 366:

Whether evidence is too remote to be material is largely a matter of discretion for the trial court. *State v. Baker,* 827 S.W.2d 777, 779 (Mo.App., E.D.1992). Remoteness of time goes to the weight of the testimony, not to its admissibility. *State v. Muthofer,* 731 S.W.2d 504, 509 (Mo.App., E.D.1987). The *Muthofer* court allowed evidence of acts which had occurred more than two decades prior to the crime charged. *Id.* at 509. See also [*State v. Bernard,* 849 S.W.2d 10 (Mo. banc 1993) ] at 19–20.

Defendant argues that the "signature modus-operandi/corroboration exception," enunciated in *Bernard,* was not met. This case does not involve or require the application of that exception. This case deals with prior misconduct of defendant directed to the victim of the offense on trial.

This court rejects defendant's argument, unsupported by citation, that the challenged evidence was inadmissible because the prior misconduct did not involve blows to Justin's abdomen. The challenged evidence was admissible as logically and legally relevant in that it had a legitimate tendency to establish directly the defendant's guilt of the charged offense, and the trial court did not abuse its discretion in determining that its probative value outweighed its prejudicial effect. Prong (a) of defendant's second point has no merit.

■ Defendant contends that the trial court erred in submitting Instruction 9 which reads:

### INSTRUCTION 9

If you find and believe from the evidence that the defendant was involved in offenses other than the one for which he is now on trial, you may consider that evidence on the issue of absence of mistake or accident or intent of the defendant. You may not consider such evidence for any other purpose.

Instruction 9 is based on MAI–CR 3d 310.-12. Defendant does not claim that Instruction 9 deviated from the approved instruction.

To preserve for review a claim of instruction error, any specific objection to the instruction which was not made at the trial before submission to the jury must be set forth in a motion for new trial. Rule 29.-11(d). At the instruction conference, defense counsel said, "I object to Instruction 9 because there's (sic) no other offenses here." In defendant's motion for new trial, the objection to Instruction 9 was: "Defendant believes that the term 'offense,' as used [in Instruction 9] refers to a charged crime and submits there is no evidence that he was involved in any criminal conduct, charged or otherwise."

As previously stated in the discussion under prong (a) of defendant's second point, defendant is wrong in asserting that the acts of prior misconduct must amount to a crime. Moreover, this record shows that the prior misconduct of defendant with respect to Justin transcended the proper limits of parental discipline and constituted the crime of abuse of a child. See § 568.060.1(1). Prong (b) of defendant's second point has no merit.

■ Defendant's third point is that the trial court erred "by not sustaining objections to the state's final closing argument" and by not taking appropriate action sua sponte with respect to other portions of the prosecutor's argument to which no objections were posed. Defendant's motion for new trial did not contain the criticisms of the prosecutor's argument.

During the prosecutor's challenged argument, defense counsel made only two comments. At one point defense counsel said that the prosecutor was "straying away from any evidence in this case," and asked that the prosecutor "be directed to get back to the facts." That comment did not contain the word "objection," but the trial court stated that the objection was overruled. The prosecutor immediately turned his argument to other matters. In effect, defendant's request was met.

The only other objection made by defense counsel was when the prosecutor referred to an article written by state's witness, Mary Case, M.D. The following then occurred:

[The Prosecutor]: [I]f you want to ask for that article by Dr. Case, I read from her article, the bibliography, the references that she had used, and I picked articles of the 14 or 15 she had listed that went all the way back to 1950. 1950 these articles were starting to be published about blunt trauma injury to children. From the 1950—

[Defense Counsel]: Your Honor, I think he's misquoting the evidence. I believe the testimony is 1970, and not 1950, and I object to that and move it be stricken.

[The Court]: Objection is overruled. The jury will remember the evidence.

In *State v. Parker*, 856 S.W.2d 331, 333 (Mo. banc 1993), the court said:

It is not necessary to determine the propriety of the prosecutor's argument. Even assuming the argument was improper, a conviction will be reversed for improper argument only if it is established that the comment of which appellant complains had a decisive effect on the jury's determination.

Neither of the foregoing portions of the prosecutor's argument constitutes reversible error.

■ This court has examined all of the challenged argument for possible plain error. On plain error review, improper argument will justify reversal only if its effect is decisive on the jury's determination and the de-

fendant "is saddled with the burden of demonstrating such effect." *State v. Wren*, 643 S.W.2d 800, 802 (Mo.1983). See also *State v. Wright*, 851 S.W.2d 786, 788[2] (Mo.App. 1993). That burden has not been met. Defendant's third point has no merit.

The judgment is affirmed.

PREWITT and CROW, JJ., concur.