STATE of Missouri, Respondent,

v.

Jeffrey A. GRICE, Movant–Appellant.

Jeffrey A. GRICE, Appellant,

v.

STATE of Missouri, Respondent.

Nos. 64909, 67174.

Missouri Court of Appeals,
Eastern District.

Aug. 8, 1995.

Rudloff, Nelson & Kelly, Michael D. Rudloff, University City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Cheryl A. Caponegro, Asst. Atty. Gen., Jefferson City, for respondent.

KAROHL, Judge.

In this consolidated appeal, Jeffery Grice contests convictions of first-degree murder, § 565.020 RSMo 1986, forcible rape, § 566.030 RSMo 1986, and armed criminal action, § 571.015 RSMo 1986, and denial of Rule 29.15 relief without an evidentiary hearing. We affirm.

Defendant challenges the sufficiency of the evidence to support his convictions. The evidence which supports the verdicts was as follows. On September 17, 1990, C.S., who was twelve years old, was playing in a field close to Holt Electric in Breckenridge Hills. Some boys she knew were playing football in the field. Around 7:15 p.m., she returned home and asked her mother if she could go to a nearby Schnucks to get a soda. Her mother gave C.S. a dollar and told her she could go. C.S., her sister, and a friend, Becky Jackson, borrowed some of the boys' bikes and went to Schnucks.

When they returned to the field, they told the boys that a bike was missing. The boys and girls began to search for the bike and the person or persons who stole it. The group headed back toward the Schnucks' parking lot and then toward the 7–Eleven store near St. Charles Rock Road. They returned to the Schnucks' parking lot, where someone told them he had seen some kids go behind a nearby Dollar General Store.

Becky Jackson testified that during the search for the missing bike, a tall male approached her and C.S. He asked them if they had seen a black dog. They had not. Shane McGoogan, who was riding his bike that evening, testified he saw C.S. talking to a man, who appeared to be approximately eighteen years old, at around 7:30 p.m. in the parking lot of Holt Electric. Harold Moruzzi, Jr., who was also in the vicinity that evening, testified he saw a tall male walking behind three girls who appeared to be eleven to thirteen years old.

Earlier that evening, Moruzzi, Jr. was talking on his CB to defendant and others, and they invited him to a party that was supposed to take place behind Schnucks. As Moruzzi, Jr. left the Phillips 66 gas station where he had heard about the party on his mobile CB, he saw defendant, Christopher Johnson and others at the Rally's right next door. Moruzzi, Jr. pulled into the Rally's parking lot. Defendant and Johnson got onto the hood of Moruzzi, Jr.'s car. Defendant and Johnson wanted Moruzzi, Jr. to take them over to the area of Holt Electric and Schnucks. Moruzzi, Jr. testified that as defendant and Johnson were riding on his car, Johnson asked him if he wanted to help kill somebody. Moruzzi, Jr. testified defendant said a girl had angered him and that they wanted to get her.

Dina Pierce testified that between 8:30 and 9:30 p.m. on September 17, 1990, defendant came to her home. She testified he "seemed like he was extremely upset over something" and that he was out of breath and perspiring.

Around 8:45 p.m., C.S.'s mother looked for C.S. in the field by Holt Electric. At 9:45 p.m., she called the Breckenridge Hills Police Department. She continued to search for C.S. until midnight; C.S. was then reported as missing.

Shawn Golden, an acquaintance of defendant, testified he heard defendant's voice while listening on his CB radio sometime between 10:00 and 10:30 p.m. in September 1990, although he could not recall the exact date. He heard defendant say he was behind a storage facility in Breckenridge Hills talking to someone; defendant also said he was behind Holt Electric. Golden recognized defendant's voice and also heard him identify himself by his CB handle, "Maverick."

On September 18, 1990, around 2:30 p.m., Edwin Kraisser, a relation of C.S.'s, found her body on a grassy, steep creek bed near the electric company. A pair of wet, ripped blue jeans were recovered from the nearby creek. A receipt was recovered from the right front pocket of the jeans; the receipt was from the Breckenridge Schnucks and had a time of 7:20 p.m. printed on it.

Dr. Ronald Turgeon, an associate medical examiner with St. Louis County, performed the autopsy on C.S. He testified the cause of death was strangulation. He based his conclusion on his findings of band-like injuries to the neck, hemorrhage in the strap muscles of the neck, and blood spots on the eyelids. He indicated her neck injuries were likely caused through the use of a sheet or similar piece of material, or by an arm. He also testified he found injuries suggesting forcible sexual activity. He also found several incised wounds on her arms that appeared to have been cut with a sharp-edged weapon. He concluded these cuts were made postmortem because there was no evidence of bleeding around or within the depths of the wounds.

Edward Rose, an acquaintance of defendant, testified he had two conversations with defendant in the days following C.S.'s death. In his first conversation with defendant, Rose asked defendant if he had heard about C.S.'s murder on the news. Defendant said he hadn't, but the question upset him. When Rose asked what was wrong, defendant said he had followed Christopher Johnson to the creek where he heard eight or nine voices besides Johnson's. Defendant said he heard them walking toward him, away from the creek, so he left so no one would see him.

Rose testified he had another conversation with defendant about two days later. He asked defendant about C.S.'s murder and the story regarding Christopher Johnson. Defendant said he followed Johnson down to the creek where he found various people beating C.S. and having intercourse with her. He said he held one of her legs and arms down and that he also had intercourse with her.

Nicole Pierson testified she had a conversation with defendant about C.S.'s death when defendant gave Pierson a ride home from the grocery store in the summer of 1991. Pierson asked if he knew anything about the murder; defendant said he did. She asked if he had anything to do with the murder; defendant said no. However, "he acted kind of nervous, started looking at the ground." Pierson asked, "Are you sure you didn't have anything to do with it?" Defendant replied, "Yeah, I kind of held her down while my friend raped her." She asked how they had lured C.S. to the creek. Defendant told her Matthew Funke had come up with some idea about a lost puppy. Defendant explained to Pierson that once they got C.S. into the woods, they jumped her. He told Pierson not to tell anyone what he had told her because he'd get in trouble.

Kathy Warnack testified she heard a conversation involving defendant and Christopher Johnson in the Breckenridge Hills Schnucks' parking lot during the summer of 1991. Warnack heard someone in the group mention C.S. Christopher Johnson then pointed to the creek nearby and said, "That's where we took her." Defendant said, "Yeah, I held her feet."

Angelique Szeverra testified she spoke with defendant in the summer of 1991. At the time, she was living with Dina Pierce in an apartment. Defendant came by the apartment to speak to Pierce, but she was not there. Defendant seemed upset and troubled. When Szeverra asked what was wrong, defendant asked her if she knew about the crime that was committed in Breckenridge Hills. She said she did. Defendant said he and Johnson were involved and that people were just pushing C.S. for fun, but then they were hurting her. He said C.S. was cut by a sharp object. He also said he had a feeling C.S. had died before he left.

Patrick Morici, a sergeant with the St. Louis Metropolitan Police Department, testified he arrested defendant, Johnson and Brian Faulkner in February 1992; Matthew Funke had already been arrested by this time. After being advised of his rights, defendant provided police with oral, handwritten and videotaped statements. He also made a diagram of the cuts made on C.S.'s arms. The state admitted the handwritten and videotaped statements and diagram into evidence. In addition, Morici testified he interviewed defendant and that defendant told him the following account of what occurred the evening of September 17, 1990. Defendant ran into several of his friends on Edmumd Street, which dead ends into a creek in a wooded area. C.S. was there, and defendant and his friends gathered around her as they entered the wooded area. As

they crossed the creek, one of his friends grabbed C.S. by the legs, pulling them out from under her and causing her to fall. One of his friends had a knife that he stuck in the ground next to C.S. as he attempted to undo her pants. Defendant and his friends held C.S. down. One of them used the knife to cut her pants off her and then had intercourse with her. She was screaming and trying to get away, so one of the other participants cut her wrist to get her to settle down. Two or three other participants also had intercourse with her. Eventually, the various participants noticed she was lifeless. At this point, one of the participants suggested that all of them cut her on the wrist so that, if she were found dead, none of them would know who had actually made the fatal cut. Thus, slashes were made on her arms. When some of the participants made only superficial cuts, they were encouraged to cut again, through the skin. Defendant was among those making slashes.

While defendant was in custody in the summer of 1992, he met Kenneth Secrease, another inmate. Secrease testified he overheard defendant and his father talking about the C.S. case. When Secrease inquired, defendant told him he did not have intercourse with C.S., but that he did hold her down. Defendant later told Secrease he had held C.S. by the throat and held her in the creek.

Defendant also spoke with Robert "Randy" Carpenter while in custody in the summer of 1992. Defendant first told Carpenter he was at the scene of the C.S. murder; he later confided he didn't murder her, but that he just fondled her as did the others involved in the crime.

Defendant presented evidence and testified in his own behalf. Defendant's mother and father both testified defendant was home on the night of September 17, 1990, watching Monday Night Football. Defendant's father testified that during half-time, defendant helped him into the bathtub. Defendant's father admitted he had been convicted of tampering with a witness in his son's case. Defendant's mother denied telling Ron Goldstein, an investigator with the St. Louis County Prosecutor's Office, that defendant couldn't have been involved in the rape and murder of C.S. because he was at his family's lake home in Sullivan, Missouri at the time.

Defendant testified that on the night in question he stayed at home until 7:00 or 7:15 p.m., then went to Dina Pierce's house around 8:15 p.m. At 8:30 p.m., defendant claimed he called his mother and then went back home. Defendant disavowed his statement to police and indicated that the story was not his. Rather, defendant testified the story was based upon what he had heard on the news and what the police officers told him. Defendant also disavowed the diagram of the cuts on C.S.'s arms. Furthermore, defendant denied talking to Kenneth Secrease or Randy Carpenter about his case. Finally, defendant denied telling Goldstein that he couldn't have committed the murder because he was at his family's lake house in Sullivan, Missouri, and testified, instead, that he had told Goldstein that on Monday night he watched football.

In the state's rebuttal, Goldstein testified that in February 1992, when he went to the Grice home, Mrs. Grice told him defendant could not have been there at the time of the murder because he was with the family at their lake home in Sullivan, Missouri that weekend. Goldstein testified that when he told Mrs. Grice the murder had taken place on Monday, not on the weekend, Mrs. Grice had a surprised, puzzled look on her face. Mrs. Grice said nothing to Goldstein at this time about defendant watching football on television.

Goldstein testified that defendant then came into the house. When Goldstein told defendant why he was there, defendant said, "Mom, we were down at the lake house in Sullivan, Missouri that weekend, weren't we?" When defendant's father came into the house, he, too, reiterated that the family had been at their lake house on the weekend in question. Nothing was said about Monday night or about watching football.

The state also called William Storer, a handwriting expert, in rebuttal. Storer compared known samples of defendant's handwriting with the handwriting in defendant's statement to police and the diagram of the cuts on C.S.'s arms. Based on these compar-

isons, Storer concluded defendant wrote out and signed the handwritten statement and wrote out and signed the diagram.

Defendant presented evidence in surrebuttal. Following the close of the evidence, instructions, and arguments of counsel, the jury found defendant guilty as charged. Defendant was sentenced to life imprisonment without probation or parole on Count I, murder in the first degree, life imprisonment on Count II, forcible rape, and life imprisonment on Count III, armed criminal action, with those terms to be served consecutively.

On November 18, 1993, defendant filed a pro se motion pursuant to Rule 29.15. On September 2, 1994, he filed an amended motion. The motion court denied his motion without an evidentiary hearing. Defendant presents five points on direct appeal. He also appeals the denial of his 29.15 motion.

In his first point, defendant contends the trial court erred in overruling his motion for judgment of acquittal or in the alternative for a new trial in that the state failed to prove each element of first-degree murder, forcible rape and armed criminal action.

■ In reviewing a challenge to the sufficiency of the evidence, appellate review is limited to a determination of whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt. *State v. Dulany,* 781 S.W.2d 52, 55 (Mo. banc 1989). We accept as true all of the evidence favorable to the state, including all favorable inferences drawn from the evidence, and disregard all evidence and inferences to the contrary. *Id.*

■ A person is criminally responsible for the conduct of another when either before or during the commission of an offense, with the purpose of promoting the commission of an offense, he aids or agrees to aid such other person in planning, committing or attempting to commit the offense. *State v. Jeffries,* 858 S.W.2d 821, 824 (Mo.App.E.D.1993); Section 562.041.1(2) RSMo 1986. It is not required that a defendant personally perform each of the acts constituting the elements of the crime. *Jeffries,* 858 S.W.2d at 824.

■ A person commits the crime of murder in the first degree if he knowingly causes the death of another person after deliberation upon the matter. Section 565.020 RSMo 1986. Several witnesses testified defendant participated in the events that caused C.S.'s death. Defendant's statements to police also indicated he participated. In addition, there was evidence defendant deliberated. Moruzzi, Jr. testified that a few hours before the murder defendant told him a girl had angered him and that he and Christopher Johnson were going to get her. Questions of credibility of witnesses are questions for the jury, and it is within the jury's province to believe all, some or none of any witnesses' testimony in arriving at its verdict. *Jeffries,* 858 S.W.2d at 824.

■ A person commits the crime of forcible rape if he has sexual intercourse with another person without that person's consent by the use of forcible compulsion. Section 566.030.1 RSMo 1986. Forcible rape becomes a class A felony where, in the course of committing the rape, the defendant inflicts serious physical injury on any person. Section 566.030.2 RSMo 1986. Edward Rose testified defendant told him he had intercourse with C.S. In addition, defendant's statements to the police and other witnesses indicated others had intercourse with C.S. while defendant held her down. Any evidence fairly showing affirmative participation by a defendant in aiding another to commit a crime is sufficient to support a conviction. *Jeffries,* 858 S.W.2d at 824.

■ A person commits the crime of armed criminal action when he commits a felony "by, with, or through the use, assistance, or aid of a dangerous instrument or deadly weapon." Section 571.015 RSMo 1986. Defendant's statements to police indicated one of the participants in the rape and murder of C.S. had a knife that he stuck in the ground while trying to undo C.S.'s pants and that another participant used the knife to cut her pants off. There was also evidence defendant aided these participants by holding C.S. down. Thus, there was sufficient evidence from which the jury could have found defendant guilty of armed criminal action as an

aider and abettor. *Jeffries,* 858 S.W.2d at 824.

The state adduced sufficient evidence from which a jury could have found defendant guilty beyond a reasonable doubt on the charges of first-degree murder, forcible rape and armed criminal action. The evidence recited proved every element of each charge. Point denied.

In his second point, defendant contends the trial court erred in refusing to give his proffered jury instruction A. Defendant's instruction A reads as follows:

> The presence of a person at or near the scene of an offense at the time it was committed or attempted is alone not sufficient to make him responsible for the offense, although his presence may be considered together with all of the evidence in determining his guilt or innocence.

This instruction is modeled on MAI–CR3d 310.08, Presence at or Near the Scene (effective 1–1–89).

■■■ The "presence" instruction is based on the legal concept that mere presence at the scene of a crime is insufficient to establish accessory liability. *State v. Daniels,* 861 S.W.2d 564, 566 (Mo.App.E.D.1993). As codified in Missouri, a person is criminally responsible for the conduct of another when "[e]ither before or during the commission of an offense with the purpose of promoting the commission of an offense, he aids or agrees to aid or attempts to aid such other person in planning, committing or attempting to commit the offense." Section 562.041.1(2) RSMo 1986. Presence alone is insufficient to sustain a conviction under this theory. *Daniels,* 861 S.W.2d at 566. However, proof of presence coupled with other incriminating evidence can be sufficient to sustain a conviction. *Id.*

■■ MAI–CR3d 310.08, Notes on Use 2, provides:

> This instruction should be given only if the verdict directing instruction is patterned after MAI–CR 3d 304.04 and if requested in proper form either by the defendant or by the state. However, it should be refused if there is no evidence, direct or circumstantial, that defendant was at or near the scene of an offense at the time it was committed. (citation omitted).

In addition, MAI–CR3d 304.04, Notes on Use 12, provides that "[s]ituations involving accessorial liability *may* also involve the giving of an instruction on 'mere presence.'" (our emphasis).

The trial court did not err in refusing defendant's request for the presence instruction. The verdict directors were patterned after MAI–CR3d 304.04, and defendant requested the giving of MAI–CR3d 310.08 in the proper form. The trial court's stated reason for refusing the presence instruction was that the instruction is inconsistent with an alibi defense. The chosen reason was legally wrong, but the ruling was correct.

The state presented evidence defendant was at or near the scene of the offense when it was committed and participated in its commission, whereas defendant presented evidence he was *not* at or near the scene. Defendant's request for MAI–CR3d 310.08, a cautionary instruction, was in the alternative to his alibi defense. If the jury chose to believe the state's evidence and disregard defendant's alibi evidence, defendant wanted to caution the jury against impermissibly convicting him based solely on his presence at the scene of the crime. However, there was no evidence defendant was *merely* present and not active in the commission of the crimes charged against him. Several witnesses testified defendant told them, or they heard him say, he was present *and participated.* In addition, defendant made statements to police that he was present *and participated.* Defendant disavowed his statements to witnesses and police. He presented evidence he was not at or near the scene. He did not present evidence he was merely a passive bystander at the scene. Because neither the state nor defendant submitted evidence he was *merely* present, the jury could not have convicted on mere presence. Point denied.

In his third point, defendant contends the trial court erred in giving the state's first-degree murder verdict director because it contained disjunctive submissions that were not supported by the evidence. He also ar-

gues the verdict director did not require the state to prove defendant deliberated. This point was not properly preserved for review. Thus, we review only for plain error resulting in manifest injustice. Rule 30.20. We find no error.

The state's first-degree murder verdict director was as follows:

As to Count I, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about September 17, 1990, in the County of St. Louis, State of Missouri, the defendant, Matthew Funke, Christopher Johnson, Brian Faulkner or others caused the death of [C.S.] by strangling her, and

Second, that defendant, Matthew Funke, Christopher Johnson, Brian Faulkner or others were aware that their conduct was practically certain to cause the death of [C.S.], and

Third, that defendant did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief,

then you are instructed that the offense of murder in the first degree has occurred, *and* if you further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the death of [C.S.], the defendant aided or encouraged Matthew Funke, Christopher Johnson, Brian Faulkner or others in causing the death of [C.S.] and reflected upon this matter cooly (sic) and fully,

then you will find the defendant guilty under Count I of murder in the first degree.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of murder in the first degree.

If you do find the defendant guilty under Count I of murder in the first degree, you are to assess and declare the punishment at imprisonment for life without eligibility for probation or parole. (our emphasis).

Defendant argues *State v. Bell,* 854 S.W.2d 612 (Mo.App.E.D.1993) controls this case. In *Bell,* we found paragraph third would be meaningless if the jury found the other participant, and not defendant, committed the acts listed in paragraphs first and second. *Id.* at 614. We found the phrases [defendant] "did so" after [cool reflection] "upon the matter" had no antecedent from the second paragraph. *Id.* We found paragraphs second and third would permit a guilty verdict without finding "cool deliberation" by defendant or his purpose to cause the death of the victim. *Id.* The verdict directing instruction for first-degree murder must ascribe the element of deliberation to the defendant specifically, even though the charge is premised on accessory liability. *State v. Ferguson,* 887 S.W.2d 585, 587 (Mo. banc 1994).

The verdict director in the present case ascribes the element of deliberation to defendant specifically. Paragraph fourth is similar to paragraph fourth approved in *State v. Bell,* 906 S.W.2d 737 (Mo.App.E.D.1995) (*Bell II*). Paragraph fourth in *Bell II* states:

Fourth, that with the purpose of promoting or furthering the death of Ricky Allen, the defendant aided or encouraged Dare-rus Williams in causing the death of Ricky Allen and reflected upon this matter coolly and fully, . . . .

*Id.* at 906 S.W.2d at 739. In *Bell II* we found "[t]he fourth paragraph attributes each of the elements for accessory liability, including deliberation, specifically to the defendant." *Id.* at 906 S.W.2d at 739.

In addition, paragraphs third and fourth in the present case differ from paragraphs third and fourth in *State v. Ferguson,* 887 S.W.2d 585 (Mo. banc 1994). Paragraphs third and fourth in *Ferguson* state:

Third, that defendant or Kenneth Ousely did so after deliberation, which means cool reflection upon the matter for any length of time no matter how brief, then you are instructed that the offense of murder in the first degree has occurred, and if you

further find and believe from the evidence beyond a reasonable doubt:

Fourth, that with the purpose of promoting or furthering the commission of that offense of murder in the first degree, the defendant acted together with or aided Kenneth Ousley in committing that offense, . . . .

*Ferguson,* 887 S.W.2d at 586. The court there found:

In this case, paragraph third of Instruction No. 9 charges the element of deliberation alternatively to the "defendant *or* Kenneth Ousley" (emphasis added). Couching the instruction in the disjunctive by using "or" rather than "and" allows the jurors to find the element of deliberation even if they did not believe that defendant, himself, deliberated. It is in that way that the submission of Instruction No. 9 relieves the State of its burden of proof and, thus, constitutes error.

*Id.* at 587. In the present case, paragraph third did not charge the element of deliberation alternatively to the defendant or others. Furthermore, paragraph fourth requires the jury to find *defendant* committed all the elements of accessory liability, including deliberation and acting with the purpose to cause the victim's death. Thus, the state was not relieved of its burden of proof. Pursuant to Rule 30.20, we find no plain error resulting in manifest injustice. Point denied.

In his fourth point, defendant contends the trial court erred in giving the state's aggravated forcible rape verdict director because: 1) it failed to require a finding that the defendant and his accomplices were not married to the victim, and 2) it substituted an uncharged aggravating circumstance for the one in the indictment. This point was not properly preserved for review. Thus, we review only for plain error resulting in manifest injustice. Rule 30.20. We find no plain error.

■ The state's aggravated forcible rape verdict director was as follows:

As to Count II, if you find and believe from the evidence beyond a reasonable doubt:

First, that on or about September 17, 1990, in the County of St. Louis, State of Missouri, the defendant, Matthew Funke,

Christopher Johnson, Brian Faulkner or others had sexual intercourse with [C.S.], and

Second, that defendant, Matthew Funke, Christopher Johnson, Brian Faulkner or others did so without the consent of [C.S.] by the use of forcible compulsion, and

Third, that defendant, Matthew Funke, Christopher Johnson, Brian Faulkner or others knew that sexual intercourse was being accomplished without the consent of [C.S.] by forcible compulsion, and

Fourth, that, in the course of this conduct, the defendant, Matthew Funke, Christopher Johnson, Brian Faulkner or others inflicted serious physical injury on [C.S.], then you are instructed that the offense of forcible rape has occurred, and if you further find and believe from the evidence beyond a reasonable doubt:

Fifth, that with the purpose of promoting or furthering the commission of that forcible rape, the defendant acted together with or aided Matthew Funke, Christopher Johnson, Brian Faulkner or others in committing that offense, then you will find the defendant guilty under Count II of forcible rape.

However, unless you find and believe from the evidence beyond a reasonable doubt each and all of these propositions, you must find the defendant not guilty of that offense.

Consent or lack of consent may be expressed or implied. Assent does not constitute consent if it is induced by force or duress. "Forcible compulsion" means physical force that overcomes reasonable resistance or a threat, expressed or implied, that places a person in reasonable fear of death.

As used in this instruction, the term "serious physical injury" means physical injury that creates a substantial risk of death or that causes serious disfigurement or protracted loss or impairment of the function of any part of the body.

If you do find the defendant guilty under Count II of forcible rape, you will assess and declare one of the following punishments:

1. Life imprisonment.

2. Imprisonment for a term of years fixed [by] you, but not less than ten years and not to exceed thirty years.

This instruction does not contain the element that defendant was not then married to the victim, in contravention of MAI–CR3d 320.02.1A Forcible Rape: Aggravated (effective 1–1–87). Instead, the instruction follows the format of MAI–CR3d 320.02.1A Forcible Rape: Aggravated (effective 9–1–91), which disposes of the paragraph regarding the marital status of victim and defendant. However, § 566.085 RSMo Cum.Supp.1990 (effective August 28, 1990) [1], provides:

1. No person shall be convicted of rape as defined in section 566.030 ... unless at the time of the offense the defendant is not married to the victim.

2. The defendant shall have the burden of injecting this issue.

The rape occurred in September 1990. As such, § 566.085 RSMo Cum.Supp.1990 was in effect and placed the burden upon defendant to inject the issue of marriage. Defendant failed to do so. Furthermore, MAI–CR3d 320.02.1A (effective 9–1–91), Notes on Use 4, provides that "[f]or offenses committed prior to August 28, 1991, marital status can constitute a defense to the crime of rape." Defendant raised an alibi defense. He did not claim marriage to the victim as a defense. Pursuant to Rule 30.20, we find no error resulting in manifest injustice.

Defendant also contends the forcible rape verdict director substituted an uncharged aggravating circumstance for the one found in the indictment.

■■■ If a verdict directing instruction submits a different method of committing an offense than the method charged in the information or indictment, there is a "variance." *State v. Ellis*, 853 S.W.2d 440, 443 (Mo.App. E.D.1993). Even if a variance exists between the method of committing a crime submitted in the verdict directing instruction and the method or methods alleged in the information, it is not reversible error unless a charge, new and distinct from the offense alleged in the information, is submitted to the jury. *State v. Williams*, 865 S.W.2d 794, 800 (Mo.App.S.D.1993).

■■■ In the present case, the offense submitted to the jury was not new and distinct from the offense alleged in the indictment. Count II of the indictment alleges defendant committed the class A felony of forcible rape in violation of § 566.030 RSMo 1986, and that he subjected the victim to sexual intercourse with more than one person, § 566.030.2 RSMo 1986. The verdict director also pertained to the offense of forcible rape, § 566.030 RSMo 1986, but the aggravator was that he inflicted serious physical injury on the victim, § 566.030.2 RSMo 1986. Pursuant to Rule 30.20, we find no error resulting in manifest injustice. The state proved a gang rape and the ultimate personal injury. Point denied.

In his fifth point, defendant contends the trial court erred in giving the state's armed criminal action verdict director because there was no evidence to support it. This point was not properly preserved for review. Thus, we review only for plain error resulting in manifest injustice. Rule 30.20.

■■■ As discussed in point I, there was evidence a knife was used during the rape and murder of C.S. Thus, the armed criminal action instruction was proper. Point denied.

Defendant also appeals denial of Rule 29.15 relief without an evidentiary hearing. He contends his trial counsel was ineffective for failure to: 1) object to the state's verdict directing instructions; 2) submit any verdict directors, and 3) adequately preserve the issues set forth in points III, IV and V.

■■■ Appellate review is limited to determining whether the findings, conclusions and judgment of the motion court were clearly erroneous. Rule 29.15(j). To establish a claim for ineffective assistance of counsel, defendant must prove his counsel's performance was deficient and the deficient performance prejudiced his defense. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *Sanders v. State*, 738 S.W.2d 856 (Mo. banc 1987).

1. Section 566.085 RSMo Cum.Supp.1990 was repealed effective January 1, 1995.

As discussed in points III–V, the state's verdict directors were not erroneous. Trial counsel cannot be found ineffective for failing to make non-meritorious objections, *Sidebottom v. State,* 781 S.W.2d 791, 799 (Mo. banc 1989), *cert. denied,* 497 U.S. 1032, 110 S.Ct. 3295, 111 L.Ed.2d 804 (1990). In addition, a claim of ineffective assistance for failure to preserve issues for appellate review is not cognizable in Rule 29.15 proceedings. *State v. Loazia,* 829 S.W.2d 558, 570 (Mo. App.1992). Point denied.

The convictions and denial of Rule 29.15 relief are affirmed.

PUDLOWSKI, P.J., and CRANDALL, J., concur.