STATE of Missouri, Plaintiff/Respondent,

v.

Bryan W. MARTINELLI,
Defendant/Appellant.

No. 72122.

Missouri Court of Appeals,
Eastern District,
Division One.

April 21, 1998.

Motion for Rehearing and/or Transfer to Supreme Court Denied July 8, 1998.

Application for Transfer Denied
Aug. 25, 1998.

Richard H. Sindel, Clayton, Joel Hirsch-
horn, Brian H. Bieber, Coral Gables, Fla., for
defendant/appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen.,
Joanne E. Joiner, Asst. Atty. Gen., Jefferson
City, for plaintiff/respondent.

GRIMM, Presiding Judge.

A jury found defendant guilty of first de-
gree murder, section 565.020.1 RSMo.* In
addition, it found him guilty of armed crimi-
nal action, section 571.015, and thirteen
counts of wiretapping, section 542.402.1(1).
The trial court sentenced him to life without
probation or parole for murder and a concur-
rent life sentence for armed criminal action.
Further, the trial court gave him concurrent
two year sentences on each of the wiretap-
ping counts.

* All statutory references are to RSMo 1994.

On appeal, defendant raises seven points.
His first point mandates a new trial. In this
point, he alleges he was denied a fair and
impartial trial because, during voir dire, a
juror intentionally failed to reveal he had a
prior criminal record.

In other points, defendant challenges the
sufficiency of the evidence and raises eviden-
tiary and jury instruction issues. We find
some of these points are moot and deny the
others. The judgment is reversed and re-
manded.

I. Sufficiency of Evidence

We first address defendant's fourth point,
wherein he alleges the evidence was insuffi-
cient to sustain any of the convictions.
Concerning the murder and armed criminal
action charges, he argues the evidence "sup-
ported two (2) equally valid inferences, one
pointing to guilt, the other pointing to inno-
cence." On the wiretapping counts, he con-
tends the victim lost the protection of the
wiretapping statute when she gave defen-
dant "her implied consent to be wiretapped
and ... she was wiretapped while speaking
on a portable telephone." We disagree and
deny this point.

Defendant married victim on June 21,
1985. During the next eight years, they had
three children. However, their marriage de-
teriorated and they had substantial marital
problems. In the fall or early winter of 1994,
victim mentioned getting a divorce to defen-
dant.

Thereafter, defendant placed a wiretap on
their home phone. Although the record is
unclear as to when defendant began the wire-
tap, it appears it began in January 1995. He
placed a recording machine behind a night
stand in the master bedroom and recorded
several conversations. Victim learned about
the machine and confronted him about it on
February 2. Defendant told victim he would
discontinue the recording. However, he did
not, but rather moved the machine to the
basement and continued recording.

Several of victim's friends identified re-
cordings of phone conversations with her.
All of them said they did not give permission

for their calls to be recorded. The recorded conversations occurred in March and April of 1995.

On April 19, 1995, approximately two weeks before she was killed, victim went to an attorney to see about having the marriage dissolved. After victim furnished background information and discussed a dissolution, the attorney scheduled another meeting for May 5.

That meeting did not occur. Sometime late on Thursday, May 4, victim told defendant that she had an appointment the next day to sign the dissolution petition. Defendant asked victim to give him a week to see if they could work it out. Defendant told a police officer that victim said "she'd wait a week, but she didn't think that it would make a difference." Victim postponed the appointment until May 12.

Also on that Thursday, defendant made plans to take their then seven-year old son turkey hunting. Defendant went to his parents' house and asked to borrow a shotgun and some camping equipment. After receiving permission to use them, he examined them but left them there. That evening, he purchased a hunting license, a turkey tag, and some 12–gauge shotgun shells with a rabbit/squirrel load.

Later that Thursday evening, defendant gathered up the tapes he had made of the telephone calls. He put the tapes, as well as two recording devices, in a bag. He placed the bag in the pickup truck he drove to work.

The next afternoon, Friday, May 5, he gave the bag to a close friend at work. While giving the bag, defendant said that he wanted the friend "to hold the package for him because he thought things were getting better and he didn't want to take a chance on his wife finding them and getting upset."

That evening, victim met a woman friend sometime after 5:00 p.m. They spent the evening together, talking, eating, shopping and drinking. While victim was out with her woman friend, defendant went to his parents' house and borrowed the shotgun and camping equipment. After returning home, he put the children to bed.

Sometime around 12:30 a.m. that night, which was early Saturday, May 6, victim went home, where defendant shot her. Defendant called 911. A police officer received a dispatch at 1:02 a.m. and arrived at the scene in less than a minute. Defendant was outside waving his arms and yelling. Defendant told him to hurry, he "accidentally shot [his] wife." The two of them ran into the house, and the officer saw victim just inside the front door laying on the floor.

The officer checked victim's vital signs. She was not breathing and no sounds were coming from her. The officer then asked defendant what had happened. Defendant said that he had been carrying a shotgun into the living room with some sleeping bags. When the sleeping bags and shotgun started to shift, he "went to readjust his grip on the gun and it went off and it struck" victim. Defendant indicated he was about 8 to 10 feet away from victim when the shotgun went off.

The officer then asked when this occurred. Defendant said "it couldn't have been any more than 5 minutes from the time it happened to the time [the officer] arrived."

Paramedics arrived at the house at 1:04 a.m. One of them examined victim while the other set up equipment. The examination disclosed that victim's lips and hands were a bluish-gray color and the arms and legs were already cooling. According to the paramedic, this indicated that victim had been dead "10 to 15 minutes or more."

A detective lieutenant arrived. In looking at the victim, he saw a wound in her arm "which appeared to be almost a contact-type wound." Further, he saw what he thought was stippling around the wound. Stippling occurs when there is a close gunshot and appears as little dimplets around the skin of the wound.

The lieutenant was told that defendant said he was 8 to 10 feet away when he shot victim. This caused the lieutenant to become suspicious, because the wound did not "appear to be consistent with that."

At trial, the medical examiner testified that stippling could reach up to "4½ feet, something like that."

Defendant was taken to the police station. There, a detective sergeant talked with him. He said that defendant told him he was surprised when the shotgun went off. When asked why he was surprised, defendant said "that he had forgot that the gun had been loaded." Defendant told this detective he estimated he was "eight to ten feet from her when the gun went off." When the shotgun went off, defendant said he ran over to her and "she was mumbling something or gasping for air, he wasn't sure. And then she stopped." Defendant said he did not attempt CPR, but did reach down, took hold of both her legs, and straightened them out.

Defendant told this detective that after the shooting, he panicked. He said that about 20 to 30 minutes after he shot victim, he ran through the house, looking for the portable phone. It was missing from the kitchen. Although there was a phone in the bedroom where the children were sleeping, he decided against using it because he did not want to wake the children. He ultimately found the portable phone in the living room on top of the television. The detective said that defendant did not say how long he searched for the phone, only that it was 20 to 30 minutes between the shooting and "the time he actually went to make the phone call."

The detective told defendant that "from the wound on [victim's] body it didn't seem right that he would be standing that far away ... when the gun went off." Defendant responded, "Well, I could have been mistaken. I— I accidentally bumped into her and that's when the gun went off." From that point on, defendant said he accidentally bumped into her.

Also, originally defendant told this detective that he and victim had a good marriage. After the detective told him he had information the marriage was bad, defendant then said that it had been a normal marriage with the normal amount of spats. However, since Christmas 1994, they had marital problems, and the past week before she was shot "had been a very stormy week."

When victim told defendant about the impending divorce, he was concerned about the children and their custody. In addition, defendant was mad about the divorce "and knew that the child support would also cost him a great deal and it would be hard for him to live a normal life having to pay so much money out."

This detective then went and obtained a warrant. When he read the warrant to defendant, defendant asked about the penalties for the crimes listed on the warrant. After furnishing that information, defendant said "I'd like to tell you what really happened, but I don't think I should."

At trial, a twenty-page letter defendant wrote to victim was admitted. In the letter, he described some of the problems regarding his marriage. He noted his attempts to change and the lack of response from victim. Further, he stated that if she did not change as a result of his efforts to change, he would reach his "break point."

Also, a notebook admitted at trial revealed further problems of the marriage. Defendant wrote, "I still remain changed but pressure is building." He noted that he had been following victim and she suspected him of this. He also wrote that he knew the victim was planning to file for divorce, but noted "she ain't going to divorce me." Further, he wrote, "I'm so sick of her. All she does is prove to me what a loser she is." The notes also referenced his activities including target shooting.

Defendant testified. Among many other things, he told his version of the shooting. He said that as he walked into the living room, he "stumbled on the gear, went to grab the— catch myself. When I caught myself the gun discharged and hit her." After checking on her and moving her legs, he said he tried to call 911. He ran around in the house and down to the basement looking for the portable phone. He finally found the phone on the television and called 911. He said that from the time the shotgun went off until he made the call, five to seven minutes elapsed.

Defendant was asked about his statements to the police regarding their suspicions of a contact-type wound. He said that he told the police that "maybe the gun bumped up after it went off but I told them over and over where I was at, the distance, and where I felt

I was." Further, he said that he did not tell the police that he "accidentally bumped her and the gun went off." Rather, he said, "if I dropped the gun and the gun bumped into her, I don't know."

Defendant denied telling the detective that "I'd like to tell you what really happened, but I don't think I should." Rather, he testified that he "told them I'd like to help you, I'd like to tell you what really happened. They were so intent on having me tell them something that didn't happen."

### A. First Degree Murder and Armed Criminal Action Counts

█ Defendant makes several arguments under this point. First, he argues that the evidence was insufficient as a matter of law to sustain the first degree murder and armed criminal action convictions. We disagree. The evidence, and the reasonable inferences derived therefrom, were sufficient to support findings by the jury that defendant knowingly caused the death of victim by shooting her with a shotgun after deliberation.

█ Defendant acknowledged that he shot victim. Thus, the only issues are intent and deliberation. Intent and deliberation are most often proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the slaying. *State v. Stallings,* 812 S.W.2d 772, 777 (Mo.App. E.D.1991); *State v. Chapman,* 876 S.W.2d 15, 18 (Mo.App. E.D.1994).

Here, the State presented sufficient evidence. Defendant's conflicting statements and explanations to the police, his letter to victim, his comments in the notebook, and the recordings of victim's phone conversations, as well as his testimony and the other evidence the State presented, created a factual dispute of opposing inferences for the jury to resolve. The evidence, and reasonable inferences, were sufficient to support the jury's findings of guilt.

█ Next, defendant argues that the evidence supported two equally valid inferences, one pointing to guilt, the other pointing to innocence. As a result, he contends, he must be acquitted.

At the time this case was briefed and argued, some question may have existed concerning the validity of the "equally valid inferences rule." However, recently the Missouri Supreme Court confirmed that the "equally valid inferences rule was effectively abolished by *State v. Grim,* 854 S.W.2d 403 (Mo. banc 1993).." *State v. Chaney,* 967 S.W.2d 47, 54 (Mo.banc 1998). The court declared that "the equally valid inferences rule should no longer be applied." *Id.* Thus, we deny this argument.

### B. Wiretapping Counts

In the second part of this point, defendant alleges the "state's evidence was insufficient as a matter of law to sustain a conviction for all the illegal wiretapping counts...." First, he contends victim lost her protection of the wiretapping statute by giving defendant "her implied consent to be wiretapped" while she was speaking on a telephone. Second, he argues that the wiretapping statute does not apply to conversations on a cordless telephone.

In 1989, the Missouri General Assembly enacted a set of laws which have been given the title "Wiretapping." These laws were modeled after federal statutes enacted in 1968 and revised in 1986. *State v. King,* 873 S.W.2d 905, 908 (Mo.App. S.D.1994).

Section 542.402.1 provides that a person is guilty of a class D felony if one "[k]nowingly intercepts, endeavors to intercept, or procures any other person to intercept or endeavor to intercept, any wire communication." The wiretapping statute further provides that it is not unlawful "[f]or a person not acting under law to intercept a wire communication ... where one of the parties to the communication has given prior consent to such interception unless such communication is intercepted for the purpose of committing any criminal or tortious act." Section 542.402.2(3).

█ Defendant argues victim gave her implied consent regarding the taping of her telephone conversations. Although not defined in Missouri, other jurisdictions have defined implied consent as "consent in fact" which is inferred "from surrounding circum-

stances indicating that the party *knowingly agreed* to the surveillance." *Williams v. Poulos,* 11 F.3d 271, 281 (1st Cir.1993) (citations omitted; emphasis in original).

The record reveals victim did not knowingly agree to the surveillance. Defendant admitted hooking up a voice-activated tape recorder to the phone jack in the master bedroom. Initially, he placed the tape recorder out of sight, behind the night stand. He testified that he told victim on February 2, 1995 that he was tape recording her telephone conversations. He further admitted that until February 2, victim did not know she was being taped.

After February 2, defendant moved the recording machine from the bedroom to the basement and hooked it up to a phone jack. He stated he "didn't want her to find the machine.... I didn't want her taking the tapes and the machines and I didn't want to anger her." Further, he admitted to taping victim's phone conversations during the following months.

■ Nothing in the record establishes that victim knowingly agreed to the taping of her phone conversations. Defendant does not point to any "knowledge" other than victim's suspicions after February 2, 1995. "Deficient notice will almost always defeat a claim of implied consent." *United States v. Lanoue,* 71 F.3d 966, 981 (1st Cir.1995).

Furthermore, policy considerations of wiretapping demand close examination of implied consent. Electronic eavesdropping allows for the invasion of "individuality and humanity", a principal concern of Congress upon enactment of the wiretapping statute. *United States v. Duncan,* 598 F.2d 839, 850 (4th Cir.1979). "If by merely creating a generalized suspicion that a victim's communications were possibly being intercepted, while at the same time avoiding detection, an electronic eavesdropper could bootstrap his activity from the proscribed to the permitted, the congressional purpose would be frustrated." *Id.*

The record does not contain sufficient evidence that victim gave her implied consent to be recorded. Rather, much of the evidence is to the contrary. We deny this portion of this point.

■ We turn to the second part of defendant's argument concerning the wiretapping convictions. He argues that conversations via cordless phones are radio communications, rather than wire, which are not protected communications under the wiretapping act.

Defendant relies on *State v. King.* There, the defendant's neighbor was listening to her police scanner radio, which also picks up transmissions from cordless phones. While so doing, she overheard the defendant make arrangements to buy some marijuana. 873 S.W.2d at 907. She reported this to a highway patrolman, who arrested the defendant at the place the transaction was to occur. *Id.*

Defendant filed a motion to suppress the evidence. He argued that the radio signal broadcast from his cordless phone was a "wire communication" which the neighbor unlawfully intercepted. Thus, he contended any evidence obtained based on that interception should be suppressed as a violation of the wiretap statutes. *Id.* at 909. The trial court denied the motion.

The southern district of this court affirmed, holding that the defendant's cordless telephone transmissions were outside the bounds of the wiretapping act. *Id.* The court held that "[t]here is no reasonable expectation of privacy in a communication which is broadcast by radio in all directions to be overheard by countless people who have purchased and daily use receiving devices such as a 'bearcat' scanner or who happen to have another mobile radio telephone tuned to the same frequency." *Id.*

*King* is easily distinguished. There, the radio signal was received directly from the cordless phone. Here, the voice-activated recorder was directly plugged into a phone jack in defendant and victim's home. The recording which took place came from the phone jack and the conversation carried over the phone line. Nothing in the record indicates that the recording that took place was directly received from the radio transmission from the cordless phone.

The evidence presented was sufficient to support the wiretapping charges against defendant. Defendant's fourth point of insufficiency of the evidence regarding first degree murder, armed criminal action, and illegal wiretapping is denied.

## II. Intentional Juror Misconduct

We turn now to defendant's first point, which controls our disposition of this matter. In this point, he alleges the trial court erred in denying defendant's motion for a new trial based on intentional juror misconduct. In the first subpoint, defendant contends Juror 6 intentionally failed to "reveal during jury selection/voir dire that he had numerous arrests, felony and misdemeaner (sic) convictions ... despite being directly asked to reveal his criminal record."

The grant of a new trial based upon a juror's failure to answer a question asked during voir dire or on a juror's concealment of a fact lies within the sound discretion of the trial court. *State v. Hatcher,* 835 S.W.2d 340, 342 (Mo.App. W.D.1992). Every failure by a potential juror to respond to a question during voir dire does not entitle a defendant to a new trial. *State v. Martin,* 755 S.W.2d 337, 339 (Mo.App. E.D.1988). However, a new trial is merited where (1) the basis for disqualification is investigated during voir dire, (2) complaining counsel does not have knowledge of the juror's deception, and (3) the juror's concealment of the truth is intentional. *Id.*

State concedes that defendant intentionally concealed his criminal record. This concession is proper. Juror 6 contacted the prosecutor several days after the verdict and informed him he had not been completely truthful and honest during voir dire regarding his past criminal history.

At a hearing on a contempt citation against the juror, the facts disclose that during voir dire, the prosecutor asked the panel, "[a]nybody ever been accused of committing a crime?" The juror responded, "shoplifting." He further responded he felt that he was treated fairly. In addition, he noted that his "brother-in-law [got] busted for stolen cars, chop shop," but "got off on technicalities."

The prosecutor then asked him if there were any other incidents and he replied, "that's it." Juror 6 was subsequently selected as a juror and voted to find defendant guilty.

The trial court examined the juror's prior criminal history. The record discloses he pled guilty to three felonies, in 1973, 1979, and 1985, and to a misdemeanor in 1983. On one of the felonies, defendant's probation was revoked and he served a year in jail.

The trial court found the juror to have "willfully and knowingly violated this Court's order as set out and included in MAI–CR 3d 300.02" and found him in criminal contempt. It sentenced him to six months in jail and a fine of $2,500.

Here, the record discloses that the ground for disqualification was actually explored on voir dire when the prosecutor asked the panel if anybody had ever been accused of committing a crime. Juror 6 acknowledged only shoplifting. He did not mention his felony convictions. Moreover, section 561.026(3) provides that a person who is convicted of any felony shall be forever disqualified from serving as a juror. Thus, he would have been disqualified had his prior criminal history been revealed during voir dire.

Further, there is no indication that defense counsel had knowledge of his prior convictions. The trial court found the juror's concealment of his prior criminal history intentional and the State has conceded this matter. We find no abuse of discretion in the trial court finding that Juror 6 intentionally concealed his prior criminal record.

In 1955, the Missouri Supreme Court considered a similar case wherein a juror was asked if he had been involved in any criminal action. A juror remained silent, although he had been convicted of a federal felony in 1942 and served two years imprisonment. *State v. Hermann,* 283 S.W.2d 617, 618 (Mo.Div. 1 1955). The supreme court said that "in a case such as this where a juror deliberately conceals such an important conclusive matter of disqualification as a felony conviction and one which would be so vital to a party to the case, we think it is clear that a new trial must be granted." *Id.* at 622. *See also State*

*v. Endres,* 698 S.W.2d 591 (Mo.App. E.D. 1985); *State v. Martin.*

Here, defendant has established the three requirements previously set forth. The ground for the disqualification of Juror 6 was explored by the State when the prosecutor asked the venire panel about being charged with any previous crimes and he responded only to shoplifting. The prosecutor even asked a followup question, "Any other incident?" Juror 6 replied, "That's it." Further, the other two requirements, lack of knowledge by the complaining counsel and the juror's intentional concealment are not in dispute.

Nevertheless, the State argues that two more recent cases, *State v. Chambers,* 891 S.W.2d 93 (Mo.banc 1994) and *State v. Brown,* 939 S.W.2d 882 (Mo.banc 1997), permit it to affirmatively prove that despite the misconduct of the juror, the other jurors were not subjected to improper influences. It presented such evidence to the trial court and now contends a new trial is not required.

State's reliance on these cases is misplaced and it reads these cases too broadly. In *Chambers,* two convictions for the same murder were reversed, and defendant was tried a third time. *Chambers,* 891 S.W.2d at 101. In his new trial motion, he alleged that jurors had improperly learned that he had been previously convicted and sentenced to death. The trial court conducted a hearing.

At that hearing, witness Rector while in jail said that he heard inmate Overton say that he had worked at the hotel were the jury was sequestered. Rector said that Overton said that Overton overheard jurors saying that they knew the defendant had been sentenced to death for murder, but that the State's evidence only supported a manslaughter charge. *Id.*

Overton's sworn testimony directly contradicted Rector. Specifically, Overton testified that he had not heard the jury discuss the case and denied telling Rector anything about the jury other than that it stayed at the hotel. *Id.* The trial court denied the motion, finding Rector's testimony not credible and finding Overton's testimony credible. *Id.*

The defendant in *Chambers* argued section 547.020(2) permits a new trial when the jury has been guilty of any misconduct tending to prevent a fair and due consideration of the case. The *Chambers* court reasoned that juror misconduct during trial requires a new trial "unless the state affirmatively shows that the jurors were not subject to improper influences." *Id.* Juror misconduct during deliberations creates a rebuttable presumption of prejudice, which can be overcome with evidence. *Id.*

In *Chambers,* the trial court determined that no juror misconduct occurred. It reached that conclusion by disbelieving Rector's testimony concerning alleged misconduct. The *Chambers* court found that the trial court had not abused its discretion in reaching that decision. *Id.*

*Chambers* concerns alleged misconduct during jury deliberations, which misconduct was not established. In contrast, here the trial court found that Juror 6 was personally guilty of misconduct by failing to truthfully answer questions concerning his prior criminal record. Whether Juror 6 influenced any other juror during jury deliberations is immaterial. Juror 6 improperly sat as a juror and voted to find defendant guilty. *Chambers* is inapplicable.

Nor does *Brown* aid the State. In *Brown,* the defendant was charged with two drug charges. *Brown,* 939 S.W.2d at 882. During voir dire, the prosecution asked:

> Has anybody here ever been involved in the prosecution or defense of a criminal case? In other words, have you ever gone to court to help a friend out, testify in a criminal case, or been a state's witness in any type of case? Anybody been called to testify? I see no hands. Is there anybody here who has a family member or close personal friend who has ever been charged or arrested or convicted of a crime?

*Id.* at 883.

The defendant's motion for new trial alleged that one juror had at least one conviction involving drugs. *Id.* No supporting affidavits or exhibits were attached to the motion, and apparently no evidence was of-

fered in support. The trial court denied the motion. *Id.*

The *Brown* opinion contains this paragraph: "When juror misconduct occurs during a felony trial, the verdict will be set aside unless the state affirmatively proves that despite the misconduct, the other jurors were not subjected to improper influences. The burden of proof does not shift until misconduct is established, however." *Id.* (footnotes omitted). Seizing on this paragraph, the State argues that it has the right to prove that despite Juror 6's misconduct, the other jurors were not subjected to improper influences.

This argument is over broad. First, we note the *Brown* court said that it was not clear from the record if the juror "did have an arrest or conviction of any kind." *Id.* at 884. Thus, since the burden was on the defendant to establish juror misconduct and he did not, the trial court's denial of this allegation was not an abuse of discretion.

In addition, the *Brown* court noted that the prosecutor's question, when considered in context, "did not directly ask members of the venire panel if they had ever been arrested or convicted." *Id.* It noted that the responses from the panel demonstrated that the prosecutor's voir dire examination emphasized arrests and convictions of relatives and friends of the venireperson, not of the venirepersons themselves. Thus, the *Brown* court held that the question "does not necessarily apply to someone with a criminal record." *Id.*

In contrast to the facts in *Brown*, here the question asked Juror 6 was clear and unambiguous. Juror 6 did not answer it truthfully, he had prior criminal convictions, and his prior convictions are established in the record. *Brown*, unlike the case before us, was not a case of intentional concealment nor jury misconduct and therefore is not applicable. Under the holding of *Hermann* and its progeny, this point is granted.

Defendant also alleges in this point that the trial court erred in denying a new trial based on alleged misconduct of another juror. Our holding on this point does not require consideration of that allegation.

### III. Refusal to Admit Testimonial Evidence

Defendant's second point relates to the hearing concerning the juror's misconduct and his third point concerns alleged error in failure to disclose an expert's testing and also error in closing rebuttal argument. As those issues may not arise on retrial, we decline to address them.

We turn now to defendant's fifth point. In this point, he alleges in the first subpart that the trial court erred in refusing to admit testimonial evidence of defendant's "reputation with respect to truth, honesty and veracity . . ." Defendant contends these traits were relevant and since he testified before the jury, "his reputation as a truthful and honest person" was put at issue. In the second subpart, defendant alleges the trial court erred in refusing to admit evidence of defendant's "willingness to take a polygraph examination as requested by the interrogating police officers."

An appellate court gives substantial deference to a trial court's decision on admissibility of evidence and will not disturb that decision absent a showing of abuse of discretion. *State v. Seiter*, 949 S.W.2d 218, 222–23 (Mo. App. E.D.1997).

As defendant began his case, he attempted to introduce opinion evidence of his honesty. The State objected on grounds of relevancy. After a discussion in chambers, the court agreed to permit evidence of defendant's "reputation as a law abiding citizen or as a peaceable person. That's it." The court agreed with the State that truthfulness and honesty would not be allowed.

A defendant is generally entitled to present evidence of his reputation concerning those traits of character which ordinarily would be involved in the commission of the charged offense. *State v. Graham*, 906 S.W.2d 771, 780 (Mo.App. W.D.1995). Evidence of good reputation as to character traits inherent in the crime charged is relevant to show the improbability of the defendant committing the crime and as substantive proof of innocence. *State v. Guidorzi*, 895 S.W.2d 225, 230 (Mo.App. S.D.1995).

Testimony as to a defendant's good reputation for truthfulness does not establish the defendant's good reputation as "a peaceable and law-abiding citizen, which is the only capacity in which his reputation may be shown in defense of assault or murder." *State v. Hayes,* 295 S.W. 791, 793 (Mo.Div. 2 1927); *State v. Manning,* 682 S.W.2d 127, 130–31 (Mo.App. E.D.1984). Furthermore, defendant's reputation for truthfulness and veracity is not relevant to the armed criminal action and wiretapping counts. There is no element of deceit in these crimes. *See* sections 571.015 and 542.402. We find no abuse of discretion on the part of the trial court to exclude opinion evidence of defendant's truthfulness or veracity.

In passing, we note that defendant asserts that when he testified on his own behalf, he placed his reputation for honesty and veracity at issue. Missouri case law has established that when a defendant takes the stand, the defendant's reputation for truthfulness and veracity is put into issue. *State v. Twenter,* 818 S.W.2d 628, 634 (Mo. banc 1991). Defendant did not offer any witness concerning his reputation after he testified. Nor did the State present rebuttal evidence on this issue. The trial court did not abuse its discretion in denying the proffered evidence at the time it was offered.

### A. Polygraph Examination

In the second part of this point, defendant maintains the trial court erred in excluding his testimony regarding his "willingness to take a polygraph examination as requested by the interrogating police officers." Suffice to say, a defendant's offer or willingness to take a polygraph examination is inadmissible. *State v. Biddle,* 599 S.W.2d 182, 185 (Mo.banc 1980). Point denied.

### IV. Jury Instructions

In his sixth point, defendant alleges the trial court erred in overruling defendant's objections to several instructions. Specifically, he objects to portions of the instructions concerning first degree murder, second degree murder, involuntary manslaughter, circumstantial evidence, and definitions of terms.

We have carefully reviewed the instructions and considered them in light of defendant's objections. All instructions followed the applicable pattern instructions in MAI–CR 3d. In addition, our examination does not disclose any legal or constitutional infirmity in any of the given instructions. No jurisprudential purpose would be served by an extended discussion. Point denied.

### V. Hearsay Evidence

In defendant's final point, he alleges the trial court erred in overruling his objections and admitting testimony from Leanne Wheeler that victim "had told her in 1995 that [defendant] had struck her and given her a black eye in 1993"... and testimony from Tamara Walsh and John DeAngelo "that [victim] had told them that she was afraid to serve her husband with divorce papers." He contends this testimony is inadmissible hearsay, fails to fall under the state of mind exception, and was logically and legally irrelevant.

We first acknowledge that trial courts have broad discretion in determining the relevancy and admissibility of evidence. *State v. Parkhurst,* 845 S.W.2d 31, 36 (Mo. banc 1992). Regarding the state of mind hearsay exception, state of mind statements are only admissible in cases involving claims of self-defense, suicide or accidental death. *State v. Singh,* 586 S.W.2d 410, 418–19 (Mo. App. S.D.1979). The declaration must be relevant to the issue of the case and the relevance of these statements must not be outweighed by the prejudicial effect of the declarations. *Id.* at 417–19.

Prior to trial, defendant filed a motion in limine to preclude the evidence of Wheeler regarding the 1993 incident on the basis that the evidence was hearsay and irrelevant. The court heard arguments and overruled the motion.

When the State offered the evidence, defendant renewed his objection. The State argued the evidence was admissible as the incident weighed on victim's mind as to why "she's fearful of the defendant for serving him with divorce papers." The trial

court found that "even though it is quite remote in time I think it probably goes to show what ... the deceased['s] state of mind would have been...." Whether evidence is too remote to be material is largely a matter of discretion for the trial court. *State v. Williams*, 865 S.W.2d 794, 804 (Mo.App. S.D. 1993). "Remoteness of time goes to the weight of the testimony, not to its admissibility." *Id.*

Over defendant's objection, Wheeler testified that about a year before victim's death, she noticed victim with a black eye and a black and blue nose. At that time, victim told her she had hit the kitchen cabinet accidentally. However, a week or two prior to victim's death, victim confided in Wheeler and said that the injuries were caused by defendant striking her when the two were engaged in an argument in their van.

■ Statements which merely recount past events do not fall within the state of mind exception unless they are a "contemporaneous statement of fear, emotion, or any other mental condition." *State v. Bell*, 950 S.W.2d 482, 484 (Mo.banc 1997). The State admits Wheeler's testimony is a narration which does not involve an indication of a specific emotion. Her testimony does not fall under the state of mind exception.

■ However, defendant did not suffer any prejudice from this testimony. In his own testimony, defendant acknowledged that he and victim were arguing in their van on the date in question. He testified the argument escalated and that victim became very angry and she hit him several times. He said that when she grabbed the wheel, he hit her with the back of his hand in the nose. Victim suffered broken blood vessels in her nose and both her eyes were black.

■ There was no dispute the incident occurred. Although the evidence was improperly admitted, other evidence before the court established essentially the same facts. In such a situation, there is no prejudice and no reversible error. *State v. Gustin*, 826 S.W.2d 409, 418–19 (Mo.App. S.D.1992). Defendant also argues the testimony of Walsh and DeAngelo does not qualify under the state of mind exception to hearsay. Walsh testified that victim told her defendant "would go berserk" if she served him with divorce papers. Walsh defined "berserk" as to "go off on a tangent, no telling what he would do." Defendant's objection was overruled and the State was permitted to show what victim's state of mind might have been at that time. DeAngelo testified that victim confided in him about a week before she was killed that she was afraid to serve her husband with divorce papers.

■ Statements of fear may be received under the state of mind exception to the hearsay rule. *State v. Ivory*, 916 S.W.2d 337, 339 (Mo.App. E.D.1995). However, such statements are admitted only when they are relevant and the relevance outweighs the prejudicial effect. *Id.* Both of the challenged statements concern victim's emotions shortly before her death. We cannot say the trial court erred in overruling defendant's objection.

■ Finally, defendant argues the testimony was neither logically nor legally relevant. Thus, he contends the admission of this testimony was inherently prejudicial and caused irreparable damage.

■ Generally, evidence of uncharged crimes, wrongs, or acts committed by the accused is inadmissible. *State v. Bernard*, 849 S.W.2d 10, 13 (Mo.banc 1993). But, evidence which tends to establish motive, intent, absence of mistake or accident, a common scheme or plan, identity or the res gestae is admissible. *Id.* Previous assaults by a defendant upon the same victim involved in the offense for which the defendant is on trial are admissible as logically and legally relevant to establish a legitimate tendency of defendant's guilt of the charged offense. *Williams*, 865 S.W.2d at 804.

As previously noted, "declarations of a decedent in a homicide case are admissible to prove the decedent's state of mind where that is relevant." *State v. Pagano*, 882 S.W.2d 326, 336 (Mo.App. S.D.1994). Defendant's defense was that he accidentally shot his wife. Thus, evidence of defendant's prior assault on victim is admissible to show defendant's intent, motive and an absence of accident. Further, any statements of fear are

also admissible under the state of mind exception.

The trial court found the probative value of the evidence outweighs its prejudicial effect. We find no abuse of discretion in admitting this evidence. Point denied.

Because of the juror's intentional failure to disclose his prior criminal record, we must reverse and remand. The trial court's judgment is reversed and the cause remanded for a new trial.

PUDLOWSKI and GARY M. GAERTNER, JJ., concur.