

# Missouri Court of Appeals
## Southern District

### In Division

STATE OF MISSOURI,     )
    )
    Plaintiff-Respondent,     )
    )
v.     )     No. SD37305
    )
DERIK CLAYTON OSBORN,     )     **Filed:  March 7, 2023**
    )
    Defendant-Appellant.     )

### APPEAL FROM THE CIRCUIT COURT OF GREENE COUNTY

Honorable Calvin R. Holden

**<u>AFFIRMED</u>**

Derik Clayton Osborn ("Defendant") appeals the judgment that convicted him of two counts of second-degree felony-murder and one count of second-degree domestic assault for killing his girlfriend, V.W. ("Victim"), along with her unborn child.  In two points on appeal, Defendant claims:  (1) the admission of "hearsay statements" by two law enforcement officers regarding Defendant's prior acts of domestic abuse against Victim violated his constitutional right to confront the State's witnesses; and (2) the evidence adduced at trial was insufficient to prove the second-degree domestic assault charge, the underlying felony necessary to support the second-degree felony-murder convictions.  Finding no merit in either claim, we affirm.

1

**The Evidence**

The State charged Defendant with one count of domestic assault in the second degree and two associated counts of second-degree murder under a felony-murder theory. The State alleged that Defendant struck or pushed Victim, which resulted in the death of Victim and her unborn child. Defendant waived his right to a jury trial, and the circuit court convicted him on all counts after a bench-trial. The circuit court sentenced Defendant to life imprisonment on the murder counts and a concurrent, seven-year sentence on the assault.

Viewed in the light most favorable to the outcome, the evidence at trial established the following.[1] At 1:44 a.m. on March 1, 2017, Defendant called 9-1-1, asking that police respond to the Kelly Greens apartments (the "Kelly Greens") in Springfield. When officers arrived, Victim was unconscious, and Defendant was in the bedroom with her. Victim required emergency medical attention, including the administration of CPR.

Defendant told officers that approximately 30 minutes before police had arrived, Victim and Defendant had come home upset with one another, and they had argued. Defendant said that Victim had fallen to the floor during the argument, and she appeared to have fallen asleep. Defendant said Victim was unresponsive, so he moved her to the

---

[1] In a court-tried criminal case, the judge's findings have the force and effect of a jury verdict. Rule 27.01(b); *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002). . . . An appellate court considers all evidence in the light most favorable to the court's decision and grants the State all reasonable inferences. *State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016). Contrary evidence and inferences are disregarded. *Id.* We defer to the fact-finder's "superior position to weigh and value the evidence, determine the witnesses' credibility and resolve any inconsistencies in their testimony." *State v. Lopez-McCurdy*, 266 S.W.3d 874, 876 (Mo. App. 2008).

*State v. Dillbeck*, 654 S.W.3d 393, 394-95 (Mo. App. S.D. 2022). We cite contrary evidence only to provide context for Defendant's claims.

2

bed, where Victim began taking "gasping breaths." Defendant told the officers that Victim was pregnant. Defendant had an injury to his toe, which he told officers had occurred during the incident, and he had a small scrape to his left ring finger.

There were red marks on the right side of Victim's neck, a "pattern" abrasion with underlying contusions was present on her left arm, a fresh scrape was on her right knee, and she had a "red raised welt" on her lower back. Dr. Carl Stacy ("Dr. Stacy"), a medical examiner, testified that the autopsy revealed hemorrhage of the muscles under Victim's neck where the abrasions were, indicating that force may have been applied there, although not enough force to have caused Victim's death. Victim also had a spinal fracture under the abrasion on her lower back, indicating a blunt-force injury to that area. The most substantial injury was a recent Grade-3 laceration to her liver that was also consistent with blunt-force trauma. Finally, Victim had also suffered injuries that indicated she had sustained blunt-force trauma to the front of her head on the right side.[2]

Dr. John Mace ("Dr. Mace"), a neurosurgeon, and Dr. Matthew Simpson ("Dr. Simpson"), Victim's trauma surgeon, both testified that Victim suffered a linear skull fracture from the parietal area down to the base of her skull, a subdural hematoma, and severe brain swelling. Dr. Stacy confirmed these injuries during the autopsy, as well as the presence of substantial subarachnoid hemorrhages. Dr. Mace testified that Victim was comatose and neurologically unresponsive because her intracranial pressure was so great that the blood flow to the brain was cut off, causing the brain to die. Dr. Mace opined that Victim had suffered a severe traumatic brain injury that was consistent with

---

[2] A CT scan of Victim performed at a Branson hospital approximately three to four weeks earlier produced "normal" results.

3

broad, blunt force – such as being slammed against a wall – and that force had caused Victim's death.

Drs. Simpson and Stacy both agreed that Victim's head injuries were caused by blunt-force trauma, and those injuries led to her brain swelling and resulting death. Drs. Mace and Simpson both testified that Victim's injuries were caused by significant force, similar to what one might expect from a high-speed automobile accident.

Dr. Stacy testified that the cause of Victim's death was homicide, given the multiple injuries to different parts of Victim's body.

Victim was 16-weeks pregnant at the time of her death. While Victim's child was still alive after Victim was declared brain-dead, the unborn child died the following day.

When the police interviewed Defendant, he told them the following. Defendant had moved into a new apartment at the Kelly Greens a few days before Victim died, and Victim was going to live with him as they worked on their relationship. On the night of the incident, he and Victim had been in a fight that had escalated throughout the day. When Victim told him that she hoped that her baby was someone else's, Defendant got upset and left for Big Whiskey's, where surveillance footage showed that he remained and drank beers for two-and-a-half to three hours. Victim came to pick Defendant up from the bar, and he pushed her out of the driver's seat.

Once Victim and Defendant were home, they started yelling and screaming at each other, and Victim sprayed him with some pepper spray that she had on a keychain.[3] Defendant said that when he went to grab the canister, Victim pulled away and fell to the floor. Defendant thought that Victim was sleeping. Eventually he took Victim to the

---

[3] Officers found a can of pepper spray in the bathtub of the hallway bathroom in an unlocked position.

4

bed.  Defendant noticed that she was having trouble breathing and her lips were turning purple, and he called 9-1-1.  Police responded to the apartment while Defendant was performing CPR on Victim.

At around 1:00 a.m. that same morning, approximately 45 minutes before Defendant had called 9-1-1, Defendant's neighbor, Carl Foerstner ("Mr. Foerstner"), heard arguing and loud screaming coming from the apartment next door.  He then heard a very loud sound of something crashing into the shared wall between their apartments that made his dining room table and pictures shake.  Mr. Foerstner thought it sounded like someone had been slammed against the wall.  Everything was quiet after that.

We will recite additional evidence in the context of our analysis of Defendant's points on appeal.

**Analysis**

*Point 1 – Hearsay Statements by Officers Regarding Prior Assaults Against Victim*

Defendant's first point claims the circuit court erred in permitting police officers Michael Carney and Dana Bishop to testify to hearsay statements Victim made to them, in which she accused Defendant of prior incidents of domestic assault against her, arguing that those statements were testimonial hearsay in violation of the Confrontation Clause in the Sixth Amendment, and their admission prejudiced Defendant because the State used the statements to show "a pattern of domestic assault by [Defendant] so as to characterize [Victim's death] as another example of this pattern[.]"

At trial, Officer Dana Bishop ("Officer Bishop") testified, over Defendant's hearsay objection, to an incident that occurred on February 6, 2017, approximately three weeks before Victim's death.  Officer Bishop went to the Grand Regency Resort in

5

response to a report of a domestic disturbance. Officer Bishop made contact with Defendant and Victim at the resort. Defendant was not injured, but Victim had blood running down her face from a cut above her eye, and she had blood on her arm. Victim was crying, visibly upset, and scared. Officer Bishop testified that Victim told her that Defendant had cornered her in the kitchen and poured spices and laundry powder all around. Victim said that she had escaped to call for help, but Defendant came out and grabbed her. Victim grabbed a pocketknife, and Defendant pushed her, causing her to hit something and "black[] out." Victim told Officer Bishop that Defendant "had to go to jail" because "he was going to kill her."

Officer Michael Carney ("Officer Carney") also testified, over Defendant's hearsay objection, that he spoke with Victim on October 28, 2016, approximately four months before Victim's death, when Victim came to police headquarters to make a complaint about domestic violence. Officer Carney said that Victim had a bump on her forehead, a bruise near her left elbow, and cuts inside her lip and on the back of her right shoulder.

We review the circuit court's admission of evidence for an abuse of discretion. *State v. Shaddox*, 598 S.W.3d 691, 694 (Mo. App. S.D. 2020). We will not disturb that broad discretion unless the ruling is against the logic of the circumstances and is so unreasonable as to show a lack of careful consideration. *Id.* If such error occurred, we will reverse only if there is a reasonable probability that it affected the outcome of the trial. *Id.*

"Hearsay is an out-of-court statement offered for the truth of the matter asserted[.]" *State v. Shade*, 657 S.W.3d 282, 295 (Mo. App. W.D. 2022). At trial, and

on appeal, the State argues that the "state of mind" exception to the hearsay rule allowed the statements to be admitted into evidence. But "falling within a hearsay exception does not resolve the Confrontation Clause issue because *Crawford* [*v. Washington*, 541 U.S. 36 (2004)] divorced the hearsay exceptions from the Confrontation Clause analysis." *State v. March*, 216 S.W.3d 663, 665 (Mo. banc 2007).

Under *Crawford*, the analysis usually involves determining whether the statements at issue were "testimonial" in nature, *id.* at 666, but "Confrontation Clause violations are subject to the harmless error test found in *Chapman v. California*, 386 U.S. 18 [] (1967). That test requires that the error be harmless beyond a reasonable doubt, meaning that there is no reasonable doubt that the error's admission failed to contribute to the jury's verdict." *Id.* at 667 (internal citation omitted).

Here, there is no reasonable doubt that the admission of this testimony failed to contribute to the verdict.

First, we note that this case was tried to a judge, not to a jury.

> A defendant's decision to try his case before a judge and without a jury has "fundamental evidentiary implications[,]" *State v. Taylor*, 504 S.W.3d 116, 122 (Mo. App. E.D. 2016), . . . "[W]e presume that the trial judge was not prejudiced by inadmissible evidence" and was not influenced by such evidence "unless it is clear from the record" that the trial court "considered and relied upon the inadmissible evidence." *Id.* at 122-23 (internal citation and quotation omitted).

*State v. Coaston*, 609 S.W.3d 527, 530 (Mo. App. S.D. 2020).

Defendant has not met his burden on appeal to show reversible error as he has not demonstrated that the challenged evidence "inflamed the fact-finder or diverted its attention from the issues to be resolved[.]" *State v. Ernst*, 164 S.W.3d 70, 75 (Mo. App. S.D. 2005) (internal citation and quotation omitted). In pronouncing Defendant guilty of

7

all charges, the judge did not reference the officers' hearsay statements as being a factor in his decision. Later, after having read the sentencing assessment report ("SAR"), in pronouncing Defendant's sentence, the judge did mention that Defendant had likely engaged in repeated acts of domestic violence, but it is well-established that the evidentiary considerations at a sentencing hearing are different from those at issue during the guilt-phase of a criminal trial. ***Martin v. State***, 291 S.W.3d 846, 849 (Mo. App. W.D. 2009). *See* Rule 29.07(a)(2)[4] (stating that the SAR "shall contain any prior criminal record of the defendant and such information about his or her characteristics, his or her financial condition, his or her social history, and the circumstances affecting his or her behavior as may be helpful in imposing sentence").

Further, at least one other witness testified at trial (without challenge on appeal) about the same previous incidents of domestic abuse. Marc Delafuente ("Mr. Delafuente"), the father of Victim's son, testified that he had heard from his son about incidents of Defendant's domestic violence toward Victim. The incidents he described had occurred in October 2016 (the incident about which Officer Carney testified) and February 2017 (the incident about which Officer Bishop testified).

As to the first incident, Mr. Delafuente testified that Victim's son told Mr. Delafuente that Victim and Defendant had "gotten into it[.]" When Mr. Delafuente personally questioned Defendant about being "physically violent" with Victim, Defendant admitted that "things got a little out of hand."

Mr. Delafuente also testified about the incident in February 2017, about which Mr. Delafuente spoke to Victim directly. Victim was crying, and she told Mr. Delafuente

---

[4] All rules references are to Missouri Court Rules (2022).

that she was going to get a restraining order against Defendant. Victim told him that she thought Defendant was going to kill her when he knocked her out that evening.

Finally, a physician's assistant testified that she treated Victim after the February 6, 2017 incident for a laceration on the side of her right eye and abrasions to her right arm and knee, and Victim told her that the father of Victim's unborn child had pushed or tripped her to the ground.[5]

Cumulative evidence is not prejudicial. ***State v. Forster***, 616 S.W.3d 436, 448 (Mo. App. E.D. 2020) (cumulative evidence is that which reiterates the same point, and a complaining party is not entitled to assert prejudice if the challenged evidence is cumulative to other admitted evidence). While Defendant argues that these incidents were too remote in time to be considered relevant, having occurred, respectively, approximately four weeks and four months before Victim's death, remoteness in time goes to the weight of the evidence for the fact-finder, not to its admissibility. ***State v. Martinelli***, 972 S.W.2d 424, 436 (Mo. App. E.D. 1998).

For all of these reasons, Point 1 is denied.

*Point 2 – Alleging Insufficient Evidence of Second-Degree Domestic Assault*

Defendant's second point claims the evidence adduced at trial was insufficient to support his conviction of second-degree domestic assault, the underlying crime supporting the two counts of second-degree felony murder. We disagree.

> Appellate review of sufficiency of the evidence is limited to whether the State has introduced adequate evidence from which a reasonable finder of fact could have found each element of the crime beyond a reasonable doubt. *State v. Hunt,* 451 S.W.3d 251, 257 (Mo. banc 2014). This Court considers all evidence in the light most favorable to the verdict and grants the State all reasonable inferences. *Id.* Contrary evidence and inferences are disregarded. *Id.*

---

[5] Defendant also does not challenge the testimony of this witness on appeal.

*State v. Lammers*, 479 S.W.3d 624, 632 (Mo. banc 2016).

In Missouri, a person can commit second-degree murder by committing felony murder. Section 565.021.1(2).[6] A person commits felony murder when he

> [c]ommits or attempts to commit *any felony*, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration or attempted perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony.

*Id.* (emphasis added).

The State must prove every element of the underlying felony beyond a reasonable doubt to prove the necessary intent-element of felony murder. *State v. Gheen*, 41 S.W.3d 598, 605 (Mo. App. W.D. 2001). Here, the State had to prove two elements: (1) that Defendant acted knowingly; and (2) that Defendant caused serious physical injury to a family or household member. *State v. Rodgers*, 557 S.W.3d 494, 497 (Mo. App. S.D. 2018).

The State charged that Defendant committed second-degree assault by knowingly causing physical injury to Victim by striking or pushing her. As previously noted, the State's evidence at trial was that Defendant struck or pushed Victim during an argument and caused her to hit the wall of the apartment, whereupon Victim struck her head and experienced a skull fracture and intracranial bleeding that ultimately led to her death and the death of her unborn child.

Defendant argues that the evidence was insufficient to convict him of second-degree assault because: (1) there was no evidence that Defendant slammed Victim

---

[6] Unless otherwise indicated, all statutory citations are to RSMo 2016, including, as applicable, statutory changes effective January 1, 2017.

10

against a wall as opposed to Victim's falling down and going unconscious; two versions of the events were equally plausible given the evidence at trial; and (2) none of the medical evidence at trial foreclosed an inference that Victim's injuries were caused by her pulling away and falling hard to the floor.

Both arguments ignore our standard of review and rely on evidence unfavorable to the verdict. They also rely on the now-abolished "equally valid inferences rule." *See State v. Chaney*, 967 S.W.2d 47, 54 (Mo. banc 1998).

> An appellate court "faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution." *Jackson* [*v. Virginia*], 443 U.S. [307], [] 326 [1979]. The conviction in this case would require reversal only under a rule that the prosecution was under an affirmative duty to disprove every reasonable hypothesis except that of guilt. In *State v. Grim* this Court rejected such a rule. See 854 S.W.2d [403,] [] 405–08 [(Mo. banc 1993)] (abrogating the circumstantial evidence rule).

*Id.*

The evidence favorable to the verdict was supported by testimony and substantial medical evidence at trial, as detailed above. Defendant's second point also fails, and the judgment of the circuit court is affirmed.

DON E. BURRELL, J. – OPINION AUTHOR

JEFFREY W. BATES, J. – CONCURS

GINGER K. GOOCH, J. – CONCURS

11